# Exhibit A

| **SUMMONS**<br>*(CITACION JUDICIAL)* | **SUM-100** |
|---|---|

| | FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)* |
|---|---|

**NOTICE TO DEFENDANT:** STANDARD CHARTERED BANK
*(AVISO AL DEMANDADO):* INTERNATIONAL, INC., an Edge Act
corporation; STANCHART SECURITIES INTERNATIONAL,
INC., a Florida corporation; CARLOS GADALA MARIA, an
individual; LUISA SERENA, an individual,

**YOU ARE BEING SUED BY PLAINTIFF:** SERGIO GAVALDON, an
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):* individual;
ANGELICA GAVALDON, an individual; S&A INBVESTMENTS,
INC., a Cayman Island Trust Company; and HARLEY
INVEST LTD., a Cayman Island Trust Company

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* | CASE NUMBER:<br>*(Número del Caso):* |
|---|---|

Superior Court of California

330 West Broadway
San Diego CA 92101

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Robert M. Traylor, Esq. (SBN 204445)      619-685-3003      619-702-6823
SELTZER CAPLAN McMAHON VITEK
750 B Street, Suite 2100
San Diego, CA 92101

| DATE:<br>*(Fecha)* | Clerk, by _____, Deputy<br>*(Secretario)*                              *(Adjunto)* |
|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Legal
Solutions
Plus

Code of Civil Procedure §§ 412.20, 465

Exhibit A, Page 8

1    Robert M. Traylor, Esq. (SBN 204445)
     SELTZER CAPLAN McMAHON VITEK
2    A Law Corporation
     750 B Street, Suite 2100
3    San Diego, California 92101-8177
     Telephone: (619) 685-3003
4    Facsimile: (619) 685-3100
     E-Mail:   traylor@scmv.com
5

6

7    Attorney for Plaintiffs SERGIO GAVALDON, ANGELICA
     GAVALDON, S&A INVESTMENTS, INC., AND
8    HARLEY INVEST LTD.

9                  **SUPERIOR COURT OF CALIFORNIA**

10                   **COUNTY OF SAN DIEGO**

11                   **CENTRAL DIVISION**

| | |
|---|---|
| 12  SERGIO GAVALDON, an individual, | Case No. |
| 13  ANGELICA GAVALDON, an individual, S&A | |
|       INVESTMENTS, INC., a Cayman Island Trust | **COMPLAINT FOR:** |
| 14  Company and HARLEY INVEST LTD. a | |
|       Cayman Island Trust Company, | 1)  **FRAUD** |
| 15 | 2)  **DECEIT** |
|              Plaintiffs, | 3)  **NEGLIGENT** |
| 16 |      **MISREPRESENTATION** |
|          v. | 4)  **BREACH OF FIDUCIARY DUTY** |
| 17 | 5)  **NEGLIGENCE/GROSS** |
|       STANDARD CHARTERED BANK |      **NEGLIGENCE** |
| 18  INTERNATIONAL, INC., an Edge Act | 6)  **UNJUST ENRICHMENT** |
|       corporation, STANCHART SECURITIES | |
| 19  INTERNATIONAL, INC., a Florida | |
|       Corporation, CARLOS GADALA MARIA, an | |
| 20  individual, LUISA SERENA, an individual, and | |
|       DOES 1-50, | |
| 21 | |
|             Defendants. | |
| 22 | |

23

24

25

26

27

28

Exhibit A, Page 9

## I.   **INTRODUCTION**

1.     Put simply, Standard Chartered Bank ripped the Gavaldons off.  By and through its so-called "relationship managers" and "investment specialists," including Defendants Luisa Serena and Carlos Gadala Maria, Standard Chartered Bank International ("SCBI") and/or Stanchart Securities ("Stanchart") (collectively "Standard Chartered," "SCB" or "the "SCB Defendants") repeatedly promised to provide, and repeatedly said they were providing, sound, prudent and suitable investment advice, i.e., consistent with the Gavaldons' conservative risk tolerance and modest income needs. SCB, the Gavaldons' self-avowed fiduciary, had a duty to act solely in the Gavaldons' best interests. The Gavaldons put their faith and confidence in SCB, and trusted SCB to act as they had promised. SCB promised that it would recommend only investment products that it knew and understood intimately, i.e., those investments on which it had done its own thorough due diligence.  The Gavaldons relied on that repeated commitment.  But SCB lied.  Repeatedly.  And consistently.  Before and after the fact.  Its fraud, and its tortious, wholesale deviation from its own standards, as well as industry practices, evidenced by SCB's own documents, and reinforced by its similar, pattern-and-practice conduct inflicted on others, are what are at issue in this case.

2.     Through a mean and deadly combination of sheer greed, direct falsehoods and gross incompetence, and while effectively controlling the Gavaldons' investments and investment choices, SCB radically reshaped the once-conservative nature of the Gavaldons' accounts by soliciting and inducing the Gavaldons to invest in a range of wholly unsuitable investments and account devices which served only SCB's interest in fees.  Unsophisticated investors, the Gavaldons reasonably and expressly relied upon SCB's false representations of financial acumen, product knowledge, due diligence and fiduciary concern for the Gavaldons' wellbeing.  None of those promises were valid or true.  And the resulting financial harm to the Gavaldons has been huge.

## II.   **THE PARTIES, JURISDICTION AND VENUE**

3.     The Gavaldons are Mexican nationals, but they reside for a substantial portion of the year in San Diego, where they own a home, and where they interacted with SCB and its San Diego office.

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

Exhibit A, Page 10

4.      Investing through a bank chartered in the United States, the Gavaldons were advised by SCB to create and allowed SCB to create and act as trustees for certain fiduciary trust structure entities through which the relevant at-issue investments were made.  In particular, in approximately 1988, based on SCB's advice, Mr. Gavaldon created S[ergio] & A[ngelica] Investments, Inc. ("S&A"), a Cayman Island trust entity, through which all of the Gavaldons investments with Standard Chartered thereafter were made.  In 2004, again at SCB's recommendation, the Gavaldons formed another Cayman Island-entity, Harley Investments, Ltd. ("Harley"), which was utilized to make yet additional investments through SCB.  For both these trust structures, Standard Chartered and/or its agents served as the trustees.  The Gavaldons are informed and believe that SCB recommended similar trust structures to other similarly situated clients, which trust structures operated thereafter in the same way as those created by SCB for the Gavaldons.

5.      Despite Standard Chartered's recommended creation of these fiduciary trust structures, SCB's investment relationship was entirely with the Gavaldons as individuals and direct customers.  SCB made all of its investment presentations, solicitation "pitches," and recommendations directly to the Gavaldons.  SCB communicated directly -- by phone, by mail, or in person – with the Gavaldons as individuals.  SCB described the Gavaldons as its clients.  Likewise, SCB gave all of its account updates directly to the Gavaldons.  In contrast, other than providing transaction instructions directed by the Gavaldons (on forms prepared by SCB), neither S&A nor Harley, nor its trustees, directed or had any involvement in the accounts.

6.      SCB at all times treated and referred to the Gavaldons as its clients and customers.  For instance, SCB described the Gavaldons as the "primary key party," and SCB sought (although disregarded) information—e.g., assets and investment goals— about the Gavaldons as individuals.  SCB took all direction, throughout the duration of the account relationship, from the Gavaldons as individuals.  Although SCB knew that the Gavaldons would and did accede to the SCB's investment recommendations, and thus SCB effectively controlled the account, SCB consistently sought the Gavaldons' authorization to effectuate the SCB-directed account activity.  At very minimum, the Gavaldons as individuals were the direct and intended beneficiaries of the SCB relationship with the Gavaldons

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

Exhibit A, Page 11

7.     In contrast, Harley and S&A essentially were pass-through entities, whose trustees were appointed by SCB and acted as SCB's agents. The SCB-appointed trustees of S&A and Harley, which were Cayman Island institutions, never entered into any substantive account-related communications between SCB and the Gavaldons. The trustees' authorizations were thereafter mere formality, and which never occurred without prior express direction from the Gavaldons, which instructions were provided to the Gavaldons by SCB. The SCB Defendants have acknowledged and expressly have testified that the Gavaldons were their customers/clients. (Hereinafter, the Gavaldons, S&A and Harley are referred to as "the Gavaldons.")

8.     The Gavaldons have had both a banking and investment relationship with SCB since the 1980s, first through American Express Bank International ("AEBI"), SCBI's predecessor. At all times, that relationship was conducted through SCB's San Diego offices, and/or through meetings held with the Gavaldons, usually in San Diego. SCB repeatedly made phone calls to and sent mail to the Gavaldons in San Diego.

9.     The SCB entity defendants are comprised of two different entities, namely SCBI and Stanchart Securities International, Inc. ("Stanchart"). SCBI is the successor entity to AEBI; they are the same entity, but merely with a change of names. SCBI acquired AEBI in February 2008, and thereafter the Gavaldons' AEBI accounts were renamed as SCBI accounts. At all relevant times, SCBI was a wholly-owned subsidiary of Standard Chartered Bank.

10.    Stanchart is a U.S. Edge Act corporation, organized under U.S. law to engage in international/foreign banking and financial operations. In February 2008, Stanchart became a licensed securities broker-dealer and FINRA member entity, which SCB unilaterally added to its customer relationship in approximately late 2007 / early 2008. SCB represented that, in 2008, all of the Gavaldons' assets were transferred to Stanchart. The Gavaldons thereafter interacted with individuals such as Luisa Serena at Stanchart, and incurred further damages through their relationship with that Stanchart.

11.    Defendant Luisa Serena was an employee of SCBI and, thereafter, served in the same position with Stanchart. She acted as the Gavaldons' last relationship manager between 2007 and

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

3

Exhibit A, Page 12

1   2009.  At all times, she acted in the course and scope of her employment with SCBI.  Ms. Serena

2   repeatedly contacted and interacted with the Gavaldons in San Diego.

3        12.     Defendant Carlos Gadala Maria was an employee of SCBI (AEBI).  He acted as the

4   Gavaldons' relationship manager starting in or about 2004.  At all times, he acted in the course and

5   scope of his employment with SCBI.  Mr. Gadala Maria repeatedly contacted and interacted with the

6   Gavaldons in San Diego.

7        13.     Personal and subject-matter jurisdiction over the SCB Defendants is appropriate, *inter*

8   *alia*, under Cal. Code Civ. Proc. §§ 410.10 and 410.70.  By its prior actions and statements – and

9   particularly by misrepresenting and seeking to avoid the plain language, and force and effect of, its

10  own arbitration agreements, as well as its duties and obligations as a member of FINRA – SCB has

11  invalidated, repudiated and/or waived the provision of any and all arbitration agreement(s) it purported

12  to have required, as well as the entirety of any contract containing such a material condition.

13       14.     Venue in the San Diego County Superior Court is proper pursuant to Cal. Code Civ.

14  Proc. §§ 395, 395.5.  All or substantially all the acts, occurrences and transactions giving rise to this

15  action took place in San Diego.

### III.    STATEMENT OF THE CASE AND GENERAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

#### A.    The Gavaldons:  Background and Investment Goals – and SCB's Legal and Self-Avowed Fiduciary Obligations

20       15.     The Gavaldons trusted essentially their entire net worth to SCB, other than their homes.

21  That money was what they depended upon for any and all of their income.  SCB expressly took upon

22  itself the role of a fiduciary, which fiduciary relationship also existed as a matter of law.  SCB abused

23  that trust.

24       16.     Sergio Gavaldon at all relevant times was retired; he now is in his mid-80s.  Mr.

25  Gavaldon is a self-made man, resulting from his retail business success in Baja California, Mexico.

26  Sergio and Angelica Gavaldon have been married for 40 years.

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

Exhibit A, Page 13

17.     The Gavaldons always have lacked investment sophistication, and therefore looked to and relied upon SCB – and the investment personnel SCB assigned to them – for their advice and purported commitment to keeping the Gavaldons' money safe.  SCB made express promises to do so.

18.     The Gavaldons had suffered through earlier economic crises in Mexico, and financial setbacks such as forced dollar-to-peso conversions for their money in Mexican financial institutions. The Gavaldons therefore had well-founded concerns with respect to banking policies and security of investments in Mexico.  The Gavaldons therefore sought the security of a reputable international bank, with U.S.-dollar denominated accounts.  SCB sold itself as having exactly these qualities, while also catering to the Gavaldons' country-of-origin and desire to communicate in Spanish.

19.     SCB knew that the Gavaldons lived off the income from their SCB-held investments. SCB further knew that the Gavaldons were conservative, income-oriented investors.  The Gavaldons historically had invested in a conservative manner.  At all times relevant here, the Gavaldons sought a diversified portfolio, consisting predominantly of income-paying and/or preservation-of-capital investments.  Indeed, in a July 2007 investment proposal authored by SCB, the Bank described the Gavaldons as "Balanced Investor[s] with an emphasis on income."

20.     The Gavaldons' initial AEBI account largely contained investments matching their income-oriented goals and conservative risk tolerance, e.g., bonds and certificates of deposit.  The Gavaldons were fortunate enough to have saved enough, and to live modestly enough, to allow them to hold only conservative assets, as they needed only a modest return on assets to generate income sufficient to their needs.

21.     The Gavaldons reasonably and completely relied upon SCB's expertise and assurances. SCB held itself out, both publicly and to the Gavaldons specifically, as an expert in financial markets and investments.  As SCB represented to the Gavaldons in one missive, **"We have a clear and consistent strategy; we do business in markets that we know intimately, with products we fully understand."**  (Emphasis added.)  SCB, both internally to its brokers, and to its investors, explicitly stated that it would recommend and manage client's assets based on client-suitability principles, and with a client's risk tolerance, investment objectives and return expectations as its priorities.  None of that was true.

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

Exhibit A, Page 14

22.   SCB claimed to operate with, and acknowledged it had, fiduciary obligations to clients such as the Gavaldons.  SCB has admitted that its fiduciary obligations were "*with respect to client assets invested in securities and investment products*."  SCB spoke of offering "an advice-based platform based on long-term relationships."  Although nominally established as a "non-discretionary" account, SCB effectively controlled the Gavaldons' account.  Even where such *de facto* control does not exist, although it did here, SCB has admitted that it was required to deal "with [the] utmost honest and good faith in [its] transactions on behalf of [its] client."  SCB breached that duty.

**B.   SCB's Transformation of the Gavaldons' Accounts:  From Conservative to High-Risk, Leveraged Investments, Replete with Unsuitable Investments**

23.   SCB had a fundamental obligation to recommend only suitable investments, and, equally as importantly, an overall suitable portfolio.   In violation of that duty, SCB recommended, advised and urged the Gavaldons over time to move their investments away from the conservative income-producing products that the Gavaldons had held.  Falsely insisting that alternatives to the Gavaldons' preferred conventional bank-like products (e.g., certificates of deposit) or bonds were more suitable and better would meet their investment/ goals and risk tolerance, SCB steadily convinced the Gavaldons to change the composition of their accounts.  The end result of SCB's actions was accounts that were suitable only for an aggressive investor, willing and able to take large risks in the hope of outsized returns, i.e., an investor who was completely opposite of the Gavaldons.

24.   By the fall of 2008, SCB radically had transformed the Gavaldons' accounts into ones which:

- Little in the way of cash or even liquid investments existed any longer.  For instance there were no more CDs;

- The Gavaldons' original diverse holdings of conservative bonds had been replaced with a single emerging-market junk-bond fund, which fund held bonds rated as low-grade, speculative and/or highly speculative, and even unrated bonds; and

- Illiquid and high-fee "alternative investments" (i.e., hedge funds), as well as an illiquid 'structured note," and an equity fund, which investments dominated the account.

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

Exhibit A, Page 15

25.     Because of SCB, the Gavaldons' accounts went from fixed-income to accounts heavily weighted towards equities and hedge funds, an asset allocation for which a retired couple had no need and was unsuitable.  SCB's recommended asset allocation for the Gavaldons violated even its own internal asset-allocation models.

26.     The Gavaldons are informed and believe that this SCB-directed transformation of their accounts, from cash and bonds to alternative investments and equites, including the recommended use of substantial account borrowing/leverage, was a pattern and practice of SCB's, utilized inappropriately with other similarly situated SCB clients.

27.     This overall unsuitability worked decidedly to the Gavaldons' disadvantage.  For instance, with the overall market downturn, after Madoff had been exposed as a Ponzi scheme, and after SCB's so-called "GEMSTB" investment had been exposed as full of junk and then was frozen, the Gavaldons were forced to liquidate their equity fund, for a loss of over $1.5 million.

28.     In sum, the Gavaldons' SCB-recommended portfolio was grossly unsuitable for their age, their need for income and their conservative investment goals and their low tolerance for risk.

29.     The Gavaldons are informed and believe that SCB engaged in similar tortious conduct with other similarly situated investors, namely by transforming the accounts of conservative-to-moderate investors from being initially allocated towards safe, diversified fixed-income accounts into risky and leveraged accounts that were heavily and inappropriately allocated towards equities and "alternative investments."

**C.     SCB's Recommended Investments Also Were Unsuitable When Seen Individually**

30.     The Gavaldons' accounts not only were unsuitable when seen as a whole, but also were unsuitable in their particular components.  SCB never should have urged the Gavaldons to purchase particular investments, or to utilize margin for those purchases.  Those unsuitable investments included, among others, the following:

**1.     The "GEMSTB" investment**

31.     In approximately June 2005, SCB, consistent with its general due diligence failures and overall negligence, recommended that the Gavaldons invest in a product sold as a short-term, near-or-wholly liquid bond fund, namely the Global Emerging Market Short-Term Bond (GEMSTB) fund.

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

Exhibit A, Page 16

1   SCB urged the Gavaldons to sell U.S. investment-grade bonds to generate the cash for this esoteric
2   GEMSTB purchase.

3      32.    SCB represented to the Gavaldons that this GEMSTB investment was a conservative
4   investment, appropriate for the Gavaldons given their desire for secure and, as relevant here, liquid
5   investments. SCB specifically sold GEMSTB as a conservative, low-risk, highly-liquid product with
6   the possibility of yield slightly above U.S. Treasuries. Indeed, in one document, SCB compared the
7   GEMSTB fund with SCB's U.S. Short Term Bond fund, describing each as "conservadores
8   [conservative]." SCB labeled GEMSTB as a low-risk category "2" – out of a possible 5 – investment
9   (with the risk scale increasing from 1 to 5).

10     33.    SCB's low-risk representation grossly misrepresented the nature and quality of the
11   bonds in the fund, as well as GEMSTB as a whole.

12     34.    SCB recommended GEMSTB to the Gavaldons despite not knowing anything about its
13   managers, who had no track record.

14     35.    After the initial purchase, SCB recommend additional purchases of this junk fund,
15   which such recommendations were also false and/or recklessly made, and lacked any real justification
16   when compared against the Gavaldons' financial needs, investment goals and risk tolerance.

17     36.    SCB knew that the Gavaldons depended upon redemptions from their GEMSTB
18   investment for cash needs. In other words, since it was their principal source of income, the Gavaldons
19   depended on this investment to be safe and secure.

20     37.    Contrary to SCB's representations regarding its low risk and high liquidity, the
21   GEMSTB fund was something very different in reality. This supposedly safe bond fund was actually
22   far more risky than represented, and certainly far more risky the bonds in which the Gavaldons
23   historically had investment and/or preferred, and the funds which SCB had convinced the Gavaldons to
24   sell and replace with GEMSTB.

25     38.    Rather than providing stability, GEMSTB instead lost over 40% of its value in a mere
26   ten months in 2008-09. When the Gavaldons sought to sell their GEMSTB position, which they had
27   been told was liquid, they were informed, without any prior notice or having been told their investment
28   would be subject to such conditions, that they could not immediately do so, i.e., it had been frozen.

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

Exhibit A, Page 17

39.     After SCB learned that the fund was ceasing redemptions, one SCB investment specialist wrote to other apparently senior SCB managers, stating, "FYI. This is the current portfolio of the Global Emerging Market Short term Bond Fund. Not a pretty sight. Not for RM or client distribution please." The bonds which were discussed as "not a pretty sight" overwhelmingly were illiquid, low-grade junk.

40.     The Gavaldons lost over $1.2 million on GEMSTB.

41.     The Gavaldons are informed and believe that SCB recommended and directed other clients towards GEMSTB, based on similarly false assurances of safety.

### 2.     Hedge Funds and a "Structured Note"

42.     As part of its recommendations to shift the Gavaldons away from their historical pattern of investment in money market fund and bonds, SCB recommended that the Gavaldons invest in hedge funds, which, as with other non-traditional recommendations, it called "alternative investments." These were not suitable for the Gavaldons, and, like its other recommended products, were recommended primarily to enable SCB to increase the amount of fees it could make off the Gavaldons' accounts.

43.     On top of the hedge funds that SCB recommended to the Gavaldons and urged them to buy, SCB also solicited and recommended the Gavaldons' investment in a so-called structured note, which was essentially an illiquid and esoteric structured product carrying hopes for a slightly higher interest rate of return than more conventional investments. The Gavaldons did not need that higher rate of return; the risk was not appropriate for them.

### 3.     Equities

44.     Compounding the gross lack of suitability recommendations elsewhere, SCB solicited the Gavaldons to invest a sizeable percentage of their accounts into one or more equity (or stock-owning) funds (e.g., "Signature Global Equities"). The Gavaldons had little experience with, and no need for, any equities. These recommendations merely increased the risk in the account. The Gavaldons are informed and believe that SCB made the same equity recommendations, which were not suitable, to other similarly situated clients.

Exhibit A, Page 18

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

### 4.   Purchase of securities on margin (leverage)

45.   SCB compounded its (gross) negligence by advising the Gavaldons to utilize millions of dollars of borrowed money to fund these portfolio changes, i.e., to purchase securities on margin. Borrowing money to buy investments (so-called leverage) with clients such as the Gavaldons is *per se* unsuitable.  Leverage used with investors such as the Gavaldons merely to increase returns is all the more inappropriate.

46.   SCB recommended this use of borrowed money to purchase securities on the representation that its cost would be more than offset by higher returns.  But the Gavaldons did not need the higher returns such borrowing might produce; modest returns from their account were more than sufficient to meet their income needs.  Moreover, the higher returns were from products that themselves were not suitable.

47.   Here, SCB's recommended use of leverage was particularly and *de facto* unsuitable also because of the sheer amount of the debt that SCB recommended and knew the Gavaldons had taken on. In 2008, the Gavaldons had been counseled to use over $7 million in margin.

48.   SCB compounded its tortious conduct by encouraging the Gavaldons to maintain this substantial use of margin even when the Gavaldons expressed their discomfort with SCB's recommendation.  At one point, the Gavaldons, concerned about this debt and its cost, questioned SCB about reducing it.  Despite that expression of concern, SCB convinced the Gavaldons not to reduce it. As one investment advisor stated in his notes, "I explained to them that as long as their portfolio has a better return than the cost of leverage it is better to keep the leverage in the portfolio."

49.   The Gavaldons paid almost $2 million in interest on these SCB-recommended margin loans.  SCB encouraged the use of account margin by the Gavaldons to obtain for itself these interest payments.

### 5.   A $10 million life insurance policy

50.   To add insult to injury, SCB further counseled the purchase of an entirely unnecessary, and extremely costly, $10 million life insurance policy, requiring the payment of hundreds of thousands of dollars in annual premiums.

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

Exhibit A, Page 19

51.     The recommended lie insurance policy had no estate planning or other legitimate purpose. The Gavaldon family did not need to ensure the life of either Sergio or Angelica Gavaldon. The Gavaldon family did not face any "death tax" or other tax problems for which life insurance policies sometimes are used to address. SCB crass search for fees is illustrated by the fact that, when SCB could not obtain acceptable premium pricing for a policy on the life of Sergio Gavaldon, SCB was not dissuaded – it merely recommended that the policy be used to ensure Angelica Gavaldon's life, even though SCB knew that there was zero legitimate reason to ensure Angelica's life.

52.     SCB sold the Gavaldons the policy not only on false representations about its need (none existed), but on the additional representation that its cost would be relatively low, such that its asset value would exceed the cost. SCB told the Gavaldons that its premium would be around $75,000 a year. In fact, premiums almost tripled within a short period of time. The unanticipated cost of the premiums in turn put huge pressure on the Gavaldons' investment accounts. In total, the Gavaldons paid over $950,000 in interest alone for the policy. In turn, SCB garnered massive fees and commissions from the sale.

53.     The result of SCB's self-interested and grossly negligent, indeed fraudulent, advice was a portfolio that was extraordinarily risky. It was improperly concentrated. It was inappropriately built on borrowed money and then (over)leveraged. It was completely unsuitable, both in its individual components and especially when viewed as a whole. And it was a house of cards, dependent upon high annual returns from risky investments to produce sufficient income for the Gavaldons, to service the account debt and to pay the massive annual premiums on the unnecessary life insurance policy.

**D.      Fairfield Sentry and Bernard L. Madoff Investment Securities ("Madoff/Sentry")**

54.     SCB's reckless and/or fraudulent conduct, and its abandonment of its clients' interests in place of its self-interested greed, is exemplified by its recommendation to the Gavaldons to invest in the Fairfield Sentry fund, which SCB knew was a feeder fund into Bernard Madoff Investment Securities or "BLMIS" (hereinafter "Madoff/Sentry"). The Gavaldons lost over $2.4 million in the collapse of this SCB-recommended investment when Mr. Madoff admitted to running a Ponzi scheme, a loss that does not even take into account the supposed returns that SCB reported had been generated,. If SCB had truthfully and accurately disclosed the actual facts regarding this investment, e.g., the

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

Exhibit A, Page 20

Gavaldons' lack of internal qualification to be able to purchase it, to its riskiness, to SCB's lack of due diligence on the recommended investment, the Gavaldons never would have made these investments.

### 1. SCB's Solicitation of Madoff/Sentry to the Gavaldons, and Representations of Due Diligence

55. SCB began to promote Madoff/Sentry to certain of its clients in 2003, and thereafter solicited the Gavaldons to buy it for the first time in 2004.

56. Standard Chartered made this unsolicited recommendation through SCB's office in (and relationship managers based in) San Diego, California, which such recommendation was based on express promises that Madoff/Sentry was safe and secure, and that its recommendation was a product of its robust due diligence process. The Gavaldons expressly relied upon these and other representations over time, and, based on SCB's claims about Madoff/Sentry, depended on it as a bedrock aspect of their investments.

57. Madoff/Sentry was never a suitable investment for the Gavaldons. Before selling it, SCB internally said this: "Investing in hedge funds via the single manager route can be highly rewarding for our wealthiest private clients, <u>but entails significant 'manager risk' (which only a limited number of investors understand well)</u>." The Gavaldons never were informed of any such "manager risk," and were among those investors who did not understand the risk of such an investment at all. Despite its own internal knowledge of the inherent risk with Madoff/Sentry, SCB (inappropriately) sold Madoff/Sentry as a money-market substitute (". . . we also discussed the shift of some [of] their holdings in both the S&A Investments and Harley Invest Ltd. from the Latin Money Market Fund to Fairfield Sentry Ltd. Fund to improve the performance of the portfolios.").

58. In complete disregard of what it knew to be the case, SCB touted Madoff/Sentry as a "*risk reducer*," which would be consistent with the Gavaldons' conservative goals and risk tolerance. The Gavaldons are informed and believe that this same "risk reducer" misrepresentation was made to other similarly situated SCB clients.

59. SCB similarly touted Madoff/Sentry to the Gavaldons as a "*great diversifier*."

60. The Gavaldons actually and reasonably relied on SCB's specific representations and commitments, and especially a belief that SCB's represented due diligence capabilities and processes

Exhibit A, Page 21

would prevent the kind of unexpected loss that occurred here.  Based on SCB's recommendation, and its knowingly false or reckless promises of safety and security, and equally false representations of having done and promising to continue to do due diligence, the Gavaldons agreed to invest funds in Madoff/Sentry.  In total, over time, the Gavaldons invested, upon the direct solicitation of SCB, $2.4 million in Madoff/Sentry.

### 2. SCB lied about the Gavaldons in order to qualify them internally to purchase Madoff/Sentry

61.     The Gavaldons never should have been allowed to invest in Madoff/Sentry – they did not even qualify to do so per SCB's internal standards.  To circumvent these rules, SCB personnel lied about the Gavaldons' financial situation.  Specifically, SCB lied about the Gavaldons' net worth, need for income, and their investment experience, investment goals and investment sophistication, in order falsely to qualify the Gavaldons internally to be able to invest in Madoff/Sentry.  In particular, SCB relationship manager Carlos Gadala Maria falsely represented that the Gavaldons had a $30 million "Net Worth," and had little liquidity requirements.  Those were known falsehoods.  But for Mr. Gadala Maria's lies about the Gavaldons qualifications, the Gavaldons never would have been able even to act on SCB's recommendations to buy Madoff/Sentry.

62.     Thereafter, SCB mismarked the internal "trade ticket" used to direct the purchase of Madoff/Sentry, asserting that the Gavaldons purchase of Madoff/Sentry was an "unsolicited" investment.  That also was a lie.

63.     SCB's managers knew or should have known of this contrivance; those managers (e.g., compliance personnel) had more than sufficient documents in their possession to determine that the Gavaldons did not have assets even remotely in the neighborhood of these false representations, and were not clients who would have sought out this investment.  The Gavaldons are informed and believe that SCB knew the truth but willingly just looked the other way.

64.     SCB also failed to tell the Gavaldons that, in fact, Madoff/Sentry was only for "non-diversified" investors, and was risky, rather than safe and secure.  Specifically, internal documents reveal that SCB knew Madoff/Sentry was risky, and that it was "appropriate" only for "large" clients

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

Exhibit A, Page 22

with "special needs" who were intending to make "non-diversified" investments.  SCB never informed the Gavaldons of these facts.

65.     SCB also failed to provide the Gavaldons a Private Placement Memorandum (or "PPM"), subscription agreement or offering memoranda for Madoff/Sentry.    That failure violated SCB's own rules, as well as securities regulations.  The undisclosed Private Placement Memorandum, contrary to the representations subsequently made to the Gavaldons that Madoff/Sentry was a "risk reducer" and "greater diversifier," stated that "**THE SHARES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK**."  SCB never told the Gavaldons the truth about Madoff/Sentry.  Had the Gavaldons know this fact, they never would have invested in Madoff/Sentry.

### 3.     SCB's Further Assurances Regarding Madoff/Sentry

66.     Following the Gavaldons' initial March 2004 purchase of Madoff/Sentry, in further meetings with their relationship manager and "investment specialist," the Gavaldons continued to hear positive, reassuring things about Madoff/Sentry from SCB, consistent with the initial representations SCB made to the Gavaldons in soliciting the investment.  At multiple times during their regular meetings and account reviews, and, as an example, as specifically set forth in writing in July 2007, SCB recommended that the Gavaldons maintain their position in Madoff/Sentry.

67.     In approximately January 2008, Standard Chartered recommended that the Gavaldons invest even further monies with Madoff/Sentry.  This further recommendation was made not only by the Gavaldons' relationship manager, but also by the SCB's then-assigned "investment specialist," who further imparted that he and SCB had a thorough understanding of all SCB's approved and recommended funds and further had a reasonable basis for suggesting an increased allocation of the Gavaldons' portfolio to Madoff/Sentry.  Based on this recommendation, and relying on the same oft-stated assurances, the Gavaldons invested another $800,000 into Madoff/Sentry in January 2008 (for a total investment of $2.4 million).

68.     At all times, the Gavaldons were unaware that SCB's representations regarding Madoff/Sentry, and, independently, its supposed due diligence process and expertise, were false and replete in their omissions regarding the true facts.  For instance, during the market turmoil starting in

SELTZER CAPLAN McMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

Exhibit A, Page 23

early 2008, when the Gavaldons inquired about positive investment returns of Madoff/Sentry despite the overall market downturn, the SCB investment specialist's response was that Madoff/Sentry continued to provide positive investment returns because it had put all its assets into U.S. treasury bonds. That statement was false, and/or lacked any reasonable basis.

### 4. SCB's Solicitation of Madoff/Sentry Was a Product of SCB's Greed, Versus Any Care for the Gavaldons' Financial Well-Being

69.     SCB's interest in Madoff/Sentry had nothing to do with the well-being of its clients. Instead, SCB began to sell Madoff/Sentry only after it had secured a deal for a sufficiently large kickback on each sale. Before that, SCB refused to sell Madoff/Sentry because the "trailer fees" – which SCB explicitly referred to as a "kickback" – because the offered kickback was too low. SCB never disclosed that it was receiving such kickbacks, nor disclosed that, but for its receipt of such kickbacks, it never would have sold Madoff/Sentry in the first place.

### 5. SCB's lies regarding its due diligence on Madoff/Sentry

70.     When it decided to promote and solicit client investments into Madoff/Sentry, SCB told its clients, and the Gavaldons specifically, that it was conducting due diligence on the investment. SCB asserted, for instance that "[a] full due diligence review on the fund and it's manager has been conducted." That was a lie; SCB did no such "full" due diligence, or any sufficient due diligence. It did not conduct such "full" diligence on either the fund OR its manager. SCB explicitly knew that it did not do any, or any adequate, due diligence. Instead, SCB knew that Madoff was "special," and that it was not allowed to visit Madoff. SCB knew that Madoff would not talk to it about any aspect of its management, brokerage or custody of (alleged) assets.

71.     SCB ultimately placed hundreds of millions of dollars of its clients' money into Madoff/Sentry, and believed it had a significant, if not the largest single stake, in Madoff/Sentry. That commitment of its clients' money, and size of its position, dictated best-of-business due diligence efforts. SCB did nothing of the sort.

72.     Contrary to its representations to clients such as the Gavaldons regarding its due diligence capabilities, SCB knew that its due diligence process generally had multiple, material deficiencies and generally was inadequate, and especially inadequate with respect to hedge funds.

SELTZER CAPLAN McMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

Exhibit A, Page 24

73.     SCB nonetheless continued to recommend Madoff/Sentry to clients such as the Gavaldons regardless of such knowledge. That conduct was deceitful. In the meantime, SCB begged for ever more allocations of shares of Madoff/Sentry so that it could offer even more to its clients, and thus obtain the sought-after kickbacks and fees.

74.     Despite these known due diligence failings, SCB treated Madoff/Sentry as an exception to internal rules designed to minimize its clients' exposure to risk in other hedge funds. For instance, after acquiring AEBI, SCBI recognized that its sales force was not qualified to sell single manager hedge funds such as Madoff/Sentry. SCB further expressly recognized that its sales force was misrepresenting and did not understand Madoff/Sentry. SCB thereafter instituted a "no single manager" hedge fund rule – but, without rhyme or reason, other than its desire for fees, created a singular exception for Madoff/Sentry.

75.     SCB knew that the manager of the monies investment into the Madoff/Sentry fund was not Fairfield Greenwich Group (Fairfield or FGG), but instead was Madoff (BLMIS). SCB did not know, however, what, if any, due diligence FGG had conducted on Madoff. This fact increased SCB's obligation to perform due diligence on BLMIS directly.

76.     SCB also did only cursory due diligence of Fairfield, likely because SCB knew Madoff had custody of the invested funds. But, despite acknowledging its need to conduct due diligence of BLMIS, SCB knew its due diligence of Madoff/Sentry was especially deficient. It knew that its due diligence with Madoff/Sentry was "special," in that it did not have any access to Madoff, and knew internally that "[o]ur due diligence efforts are limited to the review of [fund performance claims] as long as the fund performs in line with what we could expect." SCB never told the Gavaldons that its due diligence of Madoff/Sentry was "limited"; indeed, quite the opposite. Review of (represented) fund performance is not due diligence.

77.     SCB also knew that other institutions also were not allowed to visit Madoff for due diligence purposes. SCB internally acknowledged its lack of information about Madoff/Sentry's risk management and compliance procedures.

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

78.   SCB ignored its own recognized failings, and allowed wholesale deviations from its own purported "due diligence cycle" – without telling its clients, such as the Gavaldons. Meanwhile, other than alleged performance of the fund, SCB maintained no due diligence file on Madoff/Sentry.

79.   Contrary to its internal discussions, SCB publicly made multiple representations regarding its Madoff/Sentry due diligence, which representations mirrored what SCB told the Gavaldons. For instance, SCB represented that "[a] full due diligence review of the fund and it's manager has been conducted by our hedge fund of funds team in Geneva which currently allocates FOF [fund of fund] money to the institutional class of this product." More pithily, SCB proclaimed: **"If we can't do our due diligence, we won't be investors."** Even after Madoff's scheme was uncovered, SCB informed the Gavaldons:  "You should know that AEB performed appropriate due diligence on FGG and the Fairfield sentry funds when the funds were made available to the clients." The representations were individually and collectively a lie.

80.   SCB represented that it, and no other party, was performing due diligence on Madoff/Sentry, and therefore cannot rely on an alleged due diligence performed by any third party. In fact, SCB did not rely on any such third party efforts.

81.   SCB's lies regarding its due diligence (or lack thereof) vis-à-vis Madoff/Sentry are especially egregious in that it ignored multiple warnings about the investment. Indeed, well before Madoff's exposure, SCB learned of concerns and/or questions regarding Madoff/Sentry; it not only ignored them, but, despite having no basis for doing so, brushed them off. For instance, when a client raised questions about Madoff, SCB responded:  "Yes we are aware and yes we are comfortable."

### 6.   SCB's Myriad Due Diligence Failures

82.   Due diligence is a mandatory requirement, and constitutes a fundamental part of the requisite responsibility to know the product one is selling.  A fiduciary bears an even greater responsibility for doing due diligence. Hedge funds require more due diligence, not less. And the due diligence process should be far more extensive with an individual fund manager, as compared to a fund of hedge funds.  Performance monitoring is not due diligence, as SCB recognized and understood, reflect by SCB's internal guidelines.

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

Exhibit A, Page 26

83.     If an entity represents that it will (or has) conducted due diligence, it must actually perform or have performed that due diligence (and if an entity believes it has no due diligence requirements, or is not subject to suitability requirements, it should make that disclosure). Not to do so is fraud. SCB's actions here were fraudulent.

84.     To start, SCB knew that it was not conducting any real due diligence. SCB never disclosed to the Gavaldons any of this information, i.e., the fact that it knew of its due diligence failings but had elected to proceed recommending Madoff/Sentry despite abdicating its due diligence responsibilities. That is fraud.

85.     SCB's basic fraud was compounded by the fact that its clients had a huge stake in Madoff/Sentry, and SCB believed it held a very significant percentage of the overall assets invested in Madoff/Sentry. Because of that belief, SCB should have been especially vigilant. Further, SCB knew it was treating Madoff/Sentry as a special or unique case, noting that "*with the exception of Fairfield Sentry*, stay away from individual hedge funds at this point."

86.     SCB's fraud is further illustrated by the fact that SCB possessed a massive number of red flags regarding Madoff/Sentry. Those red flags existed both on the face of the investment, and, if any due diligence questions had been asked, obvious further red flags would have become obvious to any reasonable and prudent investment manager.

87.     The obvious, on-the-face-of-things red flags included:

- Madoff/Sentry's represented performance defied gravity and all investment common sense. Its performance year-to-year not only was amazing, but independently, or especially when taken together as a whole, its consistency of returns, as well as its lack of volatility, were astounding.

- Madoff/Sentry performance not only defied belief, but it was all the more amazing when compared with the supposed lack of risk. In other words, it was generating equity-like gains while purporting to employing a strategy that hedged, or limited, gains.

- Madoff/Sentry's performance was all the more amazing when compared with other similar funds, as well as against its supposed comparison index, the S&P 100. The same professed investment strategy had been tried by others, and could not produce anything remotely similar.

Exhibit A, Page 27

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

- Madoff/Sentry's performance also was amazing when compared with overall market volatility and conditions, such as the March 2000 market crash, the earlier "Asian contagion," or the 2007 market drop.

88.     SCB knew or should have known that Madoff's performance representations were a red flag.  In SCB's own words: "Excessively good performance can also be a red flag."

89.     SCB accepted Madoff/Sentry's performance was based on Madoff's ability to time the market, noting, in a report, and a section entitled "Market timing," that Madoff (allegedly) "uses quantitative models with a discretionary overly to time the market and to decide when to implement the strategy."  But SCB expressly stated that "*[i]t is impossible to time markets . . . .*"  But SCB knew Madoff's strategy involved multiple layers of market timing.  SCB knew that Madoff/Sentry involved not only overall market timing, but a further timing decision as to when to implement the purported options trading to effectuate the supposed "split-strike" strategy (or to exit the market and put the supposed holdings into Treasury bonds).

90.     SCB ignored its own express awareness of market skepticism about Madoff.  SCB knew of contemporary public skepticism about Madoff, as was reflected in published articles, which SCB had in its possession, which were written well before it decided to start selling Madoff/Sentry, or to recommend Madoff/Sentry to the Gavaldons.

91.     As securities experts have noted regarding Madoff/Sentry, "the list of due diligence red flags was so long and unsettling that it should have deterred potential investors."  Or, in another expert's words, "The reality is that the warning signals were there and the salient operational features common to best-of-breed hedge funds were missing."

92.     Even minimal actual due diligence efforts would have uncovered other red flags.  For instance, the existing options market simply wasn't big enough to accommodate the number of options trades that Madoff would have had to have been making under his professed "split-strike conversion" trading strategy.  Likewise, a review of his accounts would have revealed that Madoff didn't have the securities, U.S. Treasuries, or the cash he claimed he had.  But SCB never investigated the existence of those purported holdings.  Indeed, if SCB had done any due diligence whatsoever, it would have known that BLMIS had failed to file required SEC Form 13-Fs before February 2007, and, for those

Exhibit A, Page 28

13-Fs filed thereafter, facial discrepancies exited between the amount of money BLMIS reported it was managing, and the amount it supposedly was managing.

93.     Other red flags which SCB knew about, or which it should have identified, included: The known secrecy of Madoff's operation, and his absolute lack of transparency, the lack of any electronic access to accounts, the existence of paper (versus electronic) trade tickets, the lack of staff, Madoff's use of a unknown and small, two-person auditor, and his quizzical fee structure.

94.     SCB expressly knew facts that should have and did put it on notice of problems with Madoff/Sentry. For instance, as it stated internally, that "[f]inancial institutions that invest in the Sentry fund are not allowed to go and visit Madoff for due diligence purposes." Indeed, SCB did not obtain a meeting with Madoff until April 2008, some four-to-five years *after* it began to solicit its clients to invest in Madoff/Sentry. That meeting was perfunctory and superficial.

95.     Other investment firms, ones that actually had looked into, or had attempted to look into, Madoff's operations, had declined to invest. Such firms included Goldman Sachs, Credit Suisse, and Societe Generale.  Similarly, as reported in the New York Times, "Madoff did not pass due diligence for many European hedge fund companies." One expert observed that "Madoff's operation had been blacklisted by many asset managers, and many respectable funds of hedge funds managers, in all likelihood because it could not sustain the scrutiny of quantitative analysis."

96.     Following Madoff's exposure and its investigation, the U.S. Securities and Exchange Commission found the following:

- "Many private sector firms conducted their own due diligence of Madoff's operations while considering whether to invest with Madoff or Madoff feeder funds. . . . in numerous cases their due diligence efforts were sufficient for the private entities to determine that investing with the Madoff firm was too risky, even with the limited information they were able to obtain."

- "[T]here was a preponderance of suspicion among hedge fund industry insiders that something was awry at Madoff Securities' . . . ."

- "[One prominent hedge fund expert] stated that it was 'fair to say that there [were] enough red flags that I came across that would even alert the lay person to the potential for the Madoff track record being too good to be true.'"

Exhibit A, Page 29

- The same individual "stated that it was 'fair to say that there [were] enough red flags that I came across that would even alert the lay person to the potential for the Madoff track record being too good to be true.'"

- "[B]asic due diligence work by several private entities of Madoff or Madoff feeder funds revealed numerous and significant red flags and concerns that convinced these private entities not to invest with Madoff."

- [Per one industry person], "The returns were impossible. Absolutely impossible in my opinion. No financial strategy could produce those sort of returns."

- Another industry insider stated "you can look at a Bloomberg terminal and 'in a heartbeat' know the volume trading on CBOE for a particular day and there were not enough options for Madoff to conducting his trading."

97.     Academics looking into Madoff concluded that "Madoff's returns lie well outside their theoretical bounds and should have raised suspicions about Madoff's performance." Similar analysis concluded that any basic analysis would have raised red flags regarding Madoff, as "some simple quantitative diagnostics that should have raised suspicions about Madoff's performance." One study concluded that, "with quantitative tools, it was possible to detect Madoff's fraud."

98.     SCB, however, ignored the facially obvious red flags, as well as the red flags that would have been apparent it if had done any due diligence – because it performed no due diligence.

99.     SCB lacked any due diligence file on Madoff/Sentry, other than performance returns provided by FGG.

100.    SCB did not even ask basic questions of Fairfield as to whatever due diligence Fairfield itself might have done on BLMIS, which held all the money.  Fairfield itself was the object of investor skepticism, which fact raised yet another separate set of red flags that a prudent, industry-standard due diligence process would have noticed.

101.    Standard Chartered, however, did no basic and fundamental due diligence; instead SCB forwarded money and received a fee. It was obligated to do more, and if it had done so, this loss never would have occurred.

SELTZER CAPLAN MCMAHON VITEK
750 B Street, Suite 2100
San Diego, California 92101-8177

Exhibit A, Page 30

102.    If the promised due diligence had in fact been conducted, numerous red flags regarding the Fairfield/Madoff investment should have been obvious.  The issue then is, not whether SCB was expected to have figured Madoff out, but whether a reasonable due diligence process, such as the one SCB represented to have in place, would have raised material questions regarding the proposed investment.  In turn, any reasonable investment advisor would not have recommended the Fairfield investments because of the existence of those unanswered (and unanswerable) questions.

103.    SCB's fundamental and chronic due diligence failures violated contemporary hedge fund suitability requirements.  Even before SCB recommended Madoff/Sentry to the Gavaldons, the NASD had notified its members that they **"have a heightened responsibility to investigate the hedge funds and funds of hedge funds that they recommend to customers.  Members must perform substantial due diligence into a hedge fund before making any recommendation to a customer** . . . ."  (NASD Notice to Members 03-07, NASD Reminds Members of Obligations When Selling Hedge Funds (Feb. 2003))

104.    As far back as 2003, the NASD also had issued requirements regarding basic hedge fund due diligence requirements as it pertained to the fundamental duties of entities such as SCB to recommend only suitable investments.  Specifically, the NASD stated:

> This *Notice to Members* reminds members offering NCIs of their obligations to: (1) **conduct adequate due diligence** to understand the features of the product; (2) perform a reasonable-basis suitability analysis; (3) perform customer-specific suitability analysis in connection with any recommended transactions; (4) provide a balanced disclosure of both the risks and rewards associated with the particular product, especially when selling to retail investors; (5) implement appropriate internal controls; and (6) train registered persons regarding the features, risks, and suitability of these products."

Suitability and Non-Standard Investments:  NASD Notice to Members 03-71 Non-Conventional Investments (November 2003).  SCB failed every single one of those requirements.

105.    SCB's after-the-fact internal e-mails illustrate SCB's ignorance, and expose the falsity of its "we know our products intimately" representations.  Following Madoff's exposure, SCB's director of alternative investments asked questions that revealed SCB's fundamental lack of even a basic appreciation of the Madoff/Sentry investment:  "Was 100% managed by Madoff?  Was Madoff only an advisor?  Or a fund manager?  What exactly was the relationship between the Fairfield funds

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

Exhibit A, Page 31

1   and Madoff?" SCB's Co-Head of Hedge Fund Investments similarly showed his ignorance by asking,

2   "Was Madoff in full discretion of the account managed by Fairfield Sentry?"

3       106.    Despite being aware that it knew little-to-nothing about the "investment" which it had

4   urged its clients to purchase by the millions upon millions of dollars, SCB said this publicly about its

5   due diligence: "AEB *performed appropriate due diligence on Fairfield Sentry* and Fairfield Sigma

6   funds before making the funds available to its clients. This *due diligence was revalidated periodically*

7   *in subsequent years. . . . .*" That was a lie.

8       107.    All the worse, and to compound its other, independent failings, <u>SCB explicitly knew</u>

9   <u>Madoff/Sentry was a ticking time bom</u>b. Years before Madoff/Sentry below up, SCB's head of due

10  diligence told an SCB due-diligence colleague the following:

11      •   **"there is something wrong with the fund . . . don't put your clients in it."**

12      •   **"its going to explode one of these days."**

13      •   **"it is not possible to achieve such high returns with such low volatility."**

14      108.    Thereafter, in 2008, a new head of SCB's due diligence department repeated this

15  message to SCB's senior management, expressing his view that Madoff/Sentry was "**a scam**," which

16  could "**explode**" at any time.

17      109.    The Gavaldons are informed and believe that these views, expressed by SCB's own

18  heads-of-due-diligence, were widely known inside SCB, and at its senior levels, but, focused solely on

19  the revenue from Madoff/Sentry, were ignored, and thereafter kept secret and not divulged to clients or

20  lower-ranking employees.

21      110.    Meanwhile, in direct contravention to what it knew internally, SCB was saying

22  something entirely different publicly: "We carefully select the best products in the world – either from

23  single managers or from fund of funds that represent the best the industry has to offer." That was a lie.

24      111.    Likewise, in a statement made just before Mr. Madoff was exposed, SCB "we have a

25  clear and consistent strategy, which is to do business in markets we know, with products we fully

26  understand, with clients with whom we build deep relationships." That was a lie.

27      112.    Standard Chartered's due-diligence commitment was of particular importance, as the

28  very essence of its role, since it was not a brokerage itself, was to vet the various investment advisors it

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

Exhibit A, Page 32

was recommending.  In that vein, SCB promised to "bring you some of the best money managers in the industry," and represented that it was "using a structured due diligence policy to select those we consider having a robust investment process."  SCB also represented that "[w]e also continually evaluate asset managers . . . .," thus undertaking and communicating a duty to monitor its investment recommendations.  All those representations – on which the Gavaldons reasonably relied – were false.

113.   The Gavaldons have sought from SCB the basis for SCB's due diligence representation, e.g., the due diligence file, or other documentation behind such representations; SCB first declined – indeed, refused – to provide any supporting documents, and thereafter, despite being ordered to do so, failed to produce any such file, other than Madoff-generated performance returns.

114.   Again, the issue here is not what SCB knew about the Madoff fraud, or whether or not SCB could have or should have uncovered Madoff's scheme.  Instead, the issue is whether their due diligence representations were true or not, and/or what they  knew about their own due diligence process when they made allegedly false representations to plaintiffs about that process.

## IV.   PRIOR PROCEEDINGS

115.   The Gavaldons diligently have been seeking an adjudication of their claims against SCB, and filed their first claims in 2010.

116.   In good faith, and reasonably relying on SCB's own arbitration agreements, which expressly listed FINRA, and its predecessor, the NASD, as one among several appropriate arbitration dispute resolution forums, the Gavaldons filed a Statement of Claim with FINRA in or about November 2010.

117.   Standard Chartered has tried desperately to avoid a merits determination of the Gavaldons' claims (and have already informed the Gavaldons that they intend to repeat such conduct).  Specifically, SCB has argued, in direct contravention to its own arbitration agreement(s), that FINRA lacked jurisdiction to hear the merits of the Gavaldons' claims.  Prior to the merit hearings before the appointed FINRA panel, SCB tried to stop the arbitration proceedings with both the United States District and the FINRA Director of Arbitration.  Both of those efforts failed.

118.   On or about November 28, 2012, after more than two years of litigation, including the conclusion to two weeks' of hearings on the merits, and having previously rejected SCB's initial

Exhibit A, Page 33

motion to dismiss, the FINRA panel dismissed, without explanation, the Gavaldons' FINRA action for lack of jurisdiction. The FINRA panel's decision contradicted the clear language of the arbitration agreements, as well as the fact that the panel previously had added S&A and Harley as claimants, putting any and all customers before the panel. The FINRA panel's decision also ignored the uncontradicted hearing testimony, at which, for instance, SCB witnesses admitted that the Gavaldons were the actual customers. The FINRA panel's decision also was in manifest disregard of FINRA's own eligibility rules. The FINRA panel's decision lacked any explanation or rationale; its entire statement was: "After considering all the evidence in the record, legal authorities and the parties' arguments, the Panel determined to grant Respondents' Motion to Dismiss as to all Respondents."[1]

119. The Gavaldons promptly and timely sought judicial review of the FINRA panel's Non-Award, i.e., its failure to recognize its jurisdiction, and its further failure to render an award on the merits, with the United States District Court for the Southern District of California. On or about December 15, 2015, the district court issued its final order, which declined to overturn the FINRA Panel's conclusion that FINRA lacked jurisdiction.

120. The district court, however, expressly recognized that the FINRA panel failed to reach the merits of the Gavaldons' claims. For instance, the district court noted that "[w]hile it is called an 'Award,' in this respect it does not actually award anything." The district court further noted that "the 'Award' said nothing about the merits of Plaintiffs' claim," and went on to note that "the "Award' does not appear to dispose of Plaintiffs' claims." The district court likewise recognized the Gavaldons' right to proceed to prove their case against SCB, but it elected not to advise the parties of how best to proceed to reaching that still-unrendered merits decision.

121. SCB's efforts to avoid its duties under its arbitration agreement(s) with the Gavaldons constitute a waiver of each and all of those agreements, and the agreements of which they are a part.

---

[1] Given the uncontradicted evidence establishing FINRA jurisdiction, and the clear law refuting SCB's arguments to avoid such jurisdiction, the Gavaldons are informed and believe that the FINRA panel's abdication of its obligation to decide the merits of the case arose from the dynamic whereby arbitrators, who may depend on income from their arbitrator role, and/or simply wish to be selected for panels in future cases, have an incentive to avoid issuing any significant or monetarily sizeable awards that may be regarded by future arbitrator-selecting counsel as pro-claimant.

Exhibit A, Page 34

## V.   TIMELINESS OF THE GAVALDONS' CLAIMS

122.   The Gavaldons timely moved to seek the merits determination to which they are entitled, and do so again in this Action.

123.   Following the collapse of their substantial SCB-encouraged investment in Madoff/Sentry, and the freezing of their stake in the GEMSTB bond fund, the Gavaldons diligently sought to understand what happened with their investment. They did not learn of SCB's complicity and negligence until, at the earliest, Spring 2009. In November 2010, only after SCB had rejected the Gavaldons' efforts to resolve this dispute short of litigation, despite the Gavaldons' multiple efforts towards such a compromise, the Gavaldons timely filed their initial Statement of Claim with FINRA.

124.   The Gavaldons filed their initial Statement of Claim with FINRA on or about November 24, 2010, which was less than two years after being told, among other things, that their investment into Fairfield Sentry actually was an investment with Bernard L. Madoff Investment Securities, Inc. ("BLMIS"), which had been a Ponzi scheme. The Gavaldons thereafter filed an Amended Statement of Claim on or about January 20, 2011. On or about January 18, 2012, the FINRA Panel granted the Gavaldons' motion to added Harley Invest, Ltd. and S & A Investments, Inc. as Claimants.

125.   On November 28, 2012, following almost two years of litigation (following delays caused by SCB and its counsel, including discovery misconduct and motions to delay the merit hearings), and following two weeks of hearings on the merits, the designated FINRA panel issued its "Award." That "Award," actually a non-Award, avoided a merits determination and (erroneously) concluded that the panel lacked jurisdiction to decide the merits of the case.

126.   On or about December 19, 2012, the Gavaldons timely filed their Petition to Vacate the (Non-) "Award." The district court did not act on the Gavaldons' Petition to Vacate, or SCB's Petition to Confirm, for nearly three years. On or about September 30, 2105, the district court issued its order denying the Gavaldons' Petition to Vacate. On December 15, 2015, the district court issued its order confirming the arbitration non-Award. The Gavaldons have filed this instant Action in a timely fashion thereafter.

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

Exhibit A, Page 35

1    127.    As recognized by applicable state law, any statute of limitations that might apply has

2    been waived, equitably tolled, and/or, SCB is equitably estopped from asserting any potentially

3    applicable statutes of limitation.  Further, all claims asserted in this immediate Action also would relate

4    back, under application of the relation-back doctrine, to the Gavaldons' original November 2010 filing.

5                              **FIRST CAUSE OF ACTION**

6                       **(Fraud – Against SCBI, Stanchart and Gadala-Maria)**

7    128.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1

8    through 127 above, as though set forth in full herein.

9    129.    The SCB Defendants generally promised the Gavaldons that it would put their interests

10   above those of SCB's, and specifically promised to, and had a duty to, recommend only suitable

11   investments, on which SCB had performed appropriate due diligence.

12   130.    The SCB Defendants were obligated to deal fairly, honestly and in good faith with the

13   Gavaldons, and not to conceal material facts known, as well as to inform the Gavaldons if they

14   developed any intent to act in a manner contrary to the interests of The Gavaldons.

15   131.    The SCB Defendants knowingly and intentionally misrepresented the nature of the

16   investments recommend to the Gavaldons, and further knowingly failed to disclose to the Gavaldons

17   material facts regarding the investments they recommended.  For instance, the SCB Defendants

18   promised that it knew, and would perform and had performed appropriate due diligence on, the

19   investments it recommended that the Gavaldons purchase.

20   132.    The SCB Defendants knew that its representations were false at the time they made

21   them, and/or made them recklessly and without regard for the truth.

22   133.    The SCB Defendants made such promises with the intention that the Gavaldons rely on

23   them.

24   134.    The foregoing information knowingly was misrepresented and concealed by the SCB

25   Defendants in order to deceive and defraud the Gavaldons, and to induce the Gavaldons to invest

26   monies in investments recommended by the SCB Defendants, and thereafter to prevent the Gavaldons

27   from taking meaningful action to prevent the loss of those investments.

28

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

Exhibit A, Page 36

135.     The Gavaldons believed and reasonably and justifiably relied upon the above-described material misrepresentations and omissions of the SCB Defendants, and could not in the exercise of reasonable diligence have discovered the true facts.

136.     The SCB Defendants did not in fact do the due diligence, nor did the SCB Defendants recommend suitable investments, despite their promises to have done so and that they were doing so.

137.     As a direct and proximate result of the SCB Defendants' fraudulent conduct and concealment, the Gavaldons has suffered, or will suffer, actual and pecuniary losses and damages in an amount in excess of $1 million, together with prejudgment interest, to be proven at trial.

138.     The SCB Defendants' acts as alleged above were willful, deliberate and in bad faith, and with an oppressive and malicious intent to cause harm and injury to the Gavaldons.  Under these circumstances, the Gavaldons are entitled to recover punitive damages in an amount sufficient to make an example of defendant, and to deter other similar conduct in the future.

## SECOND CAUSE OF ACTION

### (Deceit -- Against SCBI, Stanchart and Gadala-Maria)

139.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 127 above, as though set forth in full herein.

140.     The SCB Defendants and the Gavaldons were in a fiduciary relationship, and, notwithstanding this fiduciary duty, the SCB Defendants failed to disclose certain facts to the Gavaldons, and/or disclosed some facts but failed to disclose other facts, making the disclosure deceptive.

141.     The Gavaldons were not aware, and could not know by any reasonable exercise of diligence, that the SCB Defendants' representations were false and/or inherently misleading. The foregoing information knowingly was misrepresented to and concealed by the SCB Defendants in order to deceive and defraud the Gavaldons, and to induce the Gavaldons to invest monies in investments recommended by SCB, and thereafter to prevent the Gavaldons from taking meaningful action to prevent the loss of their investment.

142.     The Gavaldons believed and reasonably and justifiably relied upon the above-described material misrepresentations and omissions of the SCB Defendants.

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

Exhibit A, Page 37

143.   As a direct and proximate result of the SCB Defendants' fraudulent conduct and concealment, the Gavaldons has suffered, or will suffer, actual and pecuniary losses and damages in excess of $300,000, together with prejudgment interest, to be proven at trial.

144.   The SCB Defendants' acts as alleged above were willful, deliberate and in bad faith, and with an oppressive and malicious intent to cause harm and injury to the Gavaldons.  Under these circumstances, the Gavaldons is entitled to recover punitive damages in an amount sufficient to make an example of defendant, and to deter other similar conduct in the future.

### THIRD CAUSE OF ACTION

### (Negligent Misrepresentation – Against All Defendants)

145.   Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 127 above, as though set forth in full herein.

146.   When the SCB Defendants made representations regarding the recommended investments, such as Madoff/Sentry, to the Gavaldons, had no reasonable grounds for believing his representations were true.

147.   The SCB Defendants made the representations with the intent to induce the Gavaldons to act on their recommendations and thereafter with the intent to prevent the Gavaldons from further inquiring into the status and true facts regarding the Gavaldons' investment.

148.   Given its (special) relationship to the Gavaldons, SCB had a duty to provide the Gavaldons correct information, and to make investment recommendations that were valid, reasonable and suitable.  Instead, SCB made false representations, and/or statements that it knew and should have known were incorrect.  These statements were made as part of Standard Chartered's investment advisory relationship with the Gavaldons, and SCB knew that the Gavaldons were seeking and would be relying on SCB's statements.

149.   As a direct and proximate result of the SCB Defendants' fraudulent conduct and concealment, the Gavaldons has suffered, or will suffer, actual and pecuniary losses and damages in excess of $1 million, together with prejudgment interest, to be proven at trial

150.   The SCB Defendants' acts as alleged above were willful, deliberate and in bad faith, and with an oppressive and malicious intent to cause harm and injury to the Gavaldons.  Under these

Exhibit A, Page 38

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

1  circumstances, the Gavaldons is entitled to recover punitive damages in an amount sufficient to make

2  an example of defendant, and to deter other similar conduct in the future.

3  ### FOURTH CAUSE OF ACTION

4  ### (Breach of Fiduciary Duty – Against All Defendants)

5      151.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1

6  through 127 above, as though set forth in full herein.

7      152.    Under the facts described above, and under well-established law, SCB owed a fiduciary

8  duty to the Gavaldons.   An investment advisor owes a fiduciary relationship to its customers,

9  especially in these particular factual circumstances.

10     153.    As part of its duty to the Gavaldons, SCB had a duty of undivided loyalty to them.

11 Those fiduciary duties required the SCB Defendants to affirm and fully protect the interests of the

12 Gavaldons, to place the Gavaldons' interests over its/their own, and to avoid and refrain from any

13 action that would injure or impair the rights and interests of the Gavaldons.

14     154.    SCB expressly represented that it would act in the Gavaldons' best interest.

15     155.    At SCB's urging, and based on a long-standing account relationship with SCB and its

16 predecessor entity AEBI, the Gavaldons reasonably reposed their trust and confidence in the SCB

17 Defendants, and thereafter also reasonably listened to and acted upon the investment advice of an

18 entity that held itself out to be an expert in the investment field, and further represented that it had

19 superior access to information that was beyond the Gavaldons' ken.

20     156.    Standard Chartered assumed a duty of due care and vigilance vis-à-vis the Gavaldons'

21 money and investments, and further assumed a duty to monitor these investments.

22     157.    SCB breached its duties, which such breaches caused the Gavaldons massive

23 investment losses.   SCB breached this duty, on repeated occasions, by, among other things,

24 recommending imprudent investments that were not suitable or even viable, and by consistently

25 placing its own financial interests and profit motive ahead of the Gavaldons' interests.   SCB further

26 breached its duty by failing to do the due diligence it had promised existed, and instead actually doing

27 no such work.

28

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

Exhibit A, Page 39

158.    The SCB Defendants further failed to act as a reasonably careful investment advisor would have acted under the same or similar circumstances.

159.    The SCB Defendants' conduct was a substantial factor in causing the Gavaldons' harm.

160.    As a direct and proximate result of the SCB Defendants' fraudulent conduct and concealment, the Gavaldons has suffered, or will suffer, actual and pecuniary losses and damages in excess of $1 million, together with prejudgment interest, to be proven at trial

161.    The SCB Defendants' acts as alleged above were willful, deliberate and in bad faith, and with an oppressive and malicious intent to cause harm and injury to the Gavaldons.  Under these circumstances, The Gavaldons is entitled to recover punitive damages in an amount sufficient to make an example of defendant, and to deter other similar conduct in the future.

## FIFTH CAUSE OF ACTION

### (Negligence / Gross Negligence – Against All Defendants)

162.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 127 above, as though set forth in full herein.

163.    Standard Chartered owed a duty of care and loyalty to the Gavaldons, and to exercise reasonable care at all at times.

164.    Standard Chartered also owed a duty to perform its represented investment and asset-management functions in accord with the standards of a reasonably prudent investment advisor and manager, and in light of the express representations made to the Gavaldons.

165.    Such duties included a duty to recommend investments – and to maintain such investments – only when such investment recommendations had been sufficiently and adequately vetted for their viability and suitability.

166.    Standard Chartered breached that duty by, among other things, failing to perform the due diligence it had promised, and by failing to disclose other material information such its lack of knowledge regarding certain investments (e.g., Madoff/Sentry).

167.    Standard Chartered further breached that duty by failing to inquire of Fairfield and other investment professionals regarding their own kind and degree of due diligence Standard Chartered further breached that duty by knowing that its representations were false and unfounded.  Standard

SELTZER CAPLAN MCMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

Exhibit A, Page 40

1 Chartered further breached that duty by failing to perform the monitoring of the Gavaldons'
2 investments, which such monitoring SCB expressly had promised.

3       168.    Standard Charted breaches caused the Gavaldons massive investment losses.

4 **SIXTH CAUSE OF ACTION**

5 **(Unjust Enrichment – Against SCBI and Stanchart)**

6       169.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1
7 through 127 above, as though set forth in full herein.

8       170.    The SCB Defendants unfairly and inequitably stands in the position of having profited
9 handsomely from its misdeeds and the Gavaldons' losses. For instance, SCB charged and collected
10 substantial fees on the nominal but fictitious Madoff/Sentry account value reported to the Gavaldons.
11 The SCB Defendants' profit came from everything from the substantial fees it collected from the
12 Gavaldons' investment in Madoff/Sentry, to the interest charged on the improper margin balance, to
13 the commissions it earned from the unnecessary life insurance policy. To this day, SCB inequitably
14 retains those fees – notwithstanding its misdeeds. Disgorgement should be ordered.

15    ///

17    ///

19    ///

21    ///

23    ///

25    ///

SELTZER CAPLAN MCMAHON VITEK
750 B Street, Suite 2100
San Diego, California 92101-8177

Exhibit A, Page 41

**PRAYER FOR RELIEF**

Plaintiffs, based on the above-described facts and legal theories, seek the following:

1.    Damages, particularly loss of investment and the fees improperly charged by SCB, and including prejudgment interest at a statutory rate based on the amount of money the Gavaldons' committed to Standard Chartered's investment recommendations.

2.    Rescission.

3.    Disgorgement and/or restitution.

4.    For exemplary and punitive damages.

5.    Costs incurred in bringing and maintaining this action, including filing fees and expert fees.

6.    Attorneys' fees.

7.    All other and further relief as the Court may deem just and reasonable.


Respectfully submitted,

Dated: January 8, 2016                          SELTZER CAPLAN McMAHON VITEK
                                                A Law Corporation


                                        By:    _s/ Robert M. Traylor_
                                                Robert M. Traylor, Esq.
                                                Attorney for Plaintiffs, SERGIO GAVALDON,
                                                ANGELICA GAVALDON, S&A INVESTMENTS,
                                                INC., AND HARLEY INVEST LTD.

SELTZER CAPLAN McMAHON VITEK
750 B STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8177

Exhibit A, Page 42