UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERGIO GAVALDON, et al.,<br><br>　　　　　　　　　Plaintiffs,<br><br>v.<br><br>STANCHART SECURITIES INTERNATIONAL, INC., et al.<br><br>　　　　　　　　　Defendants. | Case No.: 16cv590-LAB (MDD)<br><br>**ORDER GRANTING IN PART MOTION FOR LEAVE TO AMEND** |

　　This is the third of three related cases, all involving Plaintiffs' loss of money as the result of bad investments. The investments they have specifically identified are shares of an emerging market bond fund, a $10 million life insurance policy, and Fairfield Sentry securities associated with the Bernard Madoff scandal. Plaintiffs' accounts were transferred from Standard Chartered Bank International (Americas) Ltd. ("SCBI") to StanChart Securities International, Inc. ("StanChart") around November of December of 2008, and these two entities are now the only Defendants in the case.

　　Plaintiffs Sergio and Angelica Gavaldon filed suit in state court, but Defendants removed it, citing diversity jurisdiction and the Edge Act, 12 U.S.C. § 632. The Court granted in part Defendants' motion to dismiss, holding that the

running of the statute of limitations as to all claims was apparent on the face of the complaint, other than claims against Defendants who were parties to case 12cv3016, *Gavaldon v. StanChart Securities International, Inc.* The Court pointed out that Plaintiffs had failed to plead fraud with particularity as required by Fed. R. Civ. P. 9(b), and had grouped the Defendants together so that it was unclear in many cases which Defendant did what. The Court also pointed out that the complaint (which had originally been filed in state court) did not meet the pleading requirements set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs amended, and Defendants again moved to dismiss. The Court granted the motion to dismiss, and directed Plaintiffs, if they thought they could cure the defects, to file a motion for leave to amend. Plaintiffs were required to attach two documents to the motion: their proposed second amended complaint (the "SAC") and a redline of the amended complaint and the SAC, showing the proposed changes. Plaintiffs have filed that motion, and Defendants have filed an opposition.

The Court's order dismissing the amended complaint (Docket no. 28) included a lengthy discussion of pleading standards and defects. The Court incorporates the reasoning of that order into this one, and does not repeat those here except as needed for clarity. Some of the defects the Court identified earlier are failure to plead fraud with particularity (as to claims sounding in fraud), and conclusory allegations of agency.

The complaint must allege the "who, what, when, where, and how" of the charged misconduct, and must identify "what is false or misleading about a statement, and why it is false." *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)). Under another formulation, the allegations must include the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *See Swartz v. KPMG LLP*, 476

F.3d 756, 764 (9th Cir. 2007). Both the original and amended complaint fell short in this area. While these complaints were replete with generalized allegations that someone at some time said something that later turned out to be false or misleading, they were lacking in specifics.

When determining whether a plaintiff has successfully pled a claim, courts do not assume a defendant already knows facts other than those mentioned in the complaint; if it were, *Iqbal* would not have rejected as inadequate the allegations about what the defendants knew and what they agreed to do. *See Iqbal*, 556 U.S. at 680–81. While the Court accepts properly-pled allegations as true for purposes of ruling on a Rule 12(b)(6) motion, it does not assume inadequately-pled allegations as true nor does it expect a defendant to know what they refer to. *See also N. Am. Catholic Educ. Programming Found., Inc. v. Womble, Carlyle, Sandridge & Rice, PPLC*, 887 F. Supp. 2d 78, 88 n.7 (D.D.C. 2012).

In the case of averments of fraud, the details alleged must be specific enough to give defendants notice of the particular conduct, so that they can defend against the charge. *Vess*, 317 F.3d at 1106. For example, many of Plaintiffs' allegations say that one of the Defendants (or, occasionally, someone working for Defendants) gave bad investment advice, with no allegation of when it happened or how the misleading statement was made. This gives the Defendant no real chance to defend. With enough details, the Defendant might be able to question its employees or search its records and find documents or information that would allow it to defend against such an allegation. In the case of investment advice, some of the possible defenses are that the advice was never given, that the advice was given by someone not acting for Defendant, that the advice given was materially different than alleged, or that the advice was given at a time or in a context that made it non-fraudulent or non-actionable. Without adequate factual allegations to give support, claims, Defendants have no meaningful opportunity to raise a defense.

Because the statute of limitations is a particular concern here and because the course of events spanned many years, it is especially important to allege when particular events happened. Omitting the "when" of various events would unfairly prevent Defendants from raising what might well be a valid statute of limitations defense. In their earlier motion to dismiss, Defendants alleged that Plaintiffs' claims were time-barred as to all investments other than those involved in the Madoff scandal.

Another reason allegations of timing are so important concerns scienter. The complaint concerns statements made at various times, and the information Defendants had changed over time. The SAC includes many allegations about internal communications or reports, in an effort to show what Defendants knew. But the timing is critical here, because fraud must be based on representations known to be false <u>at the time</u>. Making a representation that the defendant erroneously thought was true, but which later information showed was false, is not fraud. Yet another reason concerns reliance. Some statements were made after Plaintiffs had already taken action, making it impossible for those representations to have influenced their earlier decisions.

In a few cases, the pleading requirements may be relaxed pending discovery, if the evidence needed to make those allegations is within a defendant's exclusive possession. *Ebeid*, 616 F.3d at 999. That is not appropriate here, for several reasons. First, the missing information—if it exists—is within Plaintiffs' control. They or people acting for them were on the receiving end of the allegedly fraudulent communications. They know (or, at least, at one time knew) who gave them advice or made representations to them, when, and how the communications were made. Because most of the allegedly fraudulent communications occurred in the early 2000s, it may be that Plaintiffs no longer remember some of the facts they would have to allege to make specific allegations. But they have known about their claims since at least early 2011 (when they filed a statement of claim, initiating

1  FINRA arbitration) and could have recorded the information while their memories
2  were fresher.  Even though the Court has found they are entitled to equitable
3  tolling, tolling does not relax the pleading standard and cannot supply missing
4  allegations. In addition, Plaintiffs have not requested discovery or shown why
5  discovery would help them make the necessary allegations.

**Analysis: Agency**

Almost all the SAC's allegations are against SCBI. Soon after Plaintiffs' account was transferred to StanChart in late 2008, the poor state of Plaintiffs' portfolio began to become apparent.  The SAC alleges that StanChart "perpetuated" lies that SCBI had told, without offering much explanation about how.  It also alleges that after the account was transferred, SCBI remained responsible for StanChart's actions, and that StanChart assumed SCBI's liabilities. (SAC, ¶¶ 33–34.)  The existence of an agency relationship and derivative liability or are legal conclusions and ordinarily must be supported by factual allegations.

SCBI and StanChart, though separately organized, are both subsidiaries of Standard Chartered Bank, which is no longer a party to this action.  (*See* SAC, ¶ 27.)  The SAC alleges that StanChart was created in early 2008 to comply with laws regarding brokerage operations, because SCBI could not perform securities operations. (*Id.*, ¶ 33.)  Nevertheless, it concludes, SCBI was really still in fact managing Plaintiffs' account, and the two were operating as a single entity.  (*Id.*) The only facts alleged in support of this are that two employees (Luisa Serena and Ray Garnica) were employed by both entities, and "[a]ny and all StanChart activities continued to be supervised by SCBI compliance and supervisory personnel." (*Id.*, ¶33; *see also* ¶ 38 (similar allegation))  The SAC alleges that also alleges that "SCBI and StanChart shared a common interest and/or purpose, and may have acted as a single entity."  (*Id.*) It also alleges that "StanChart acted pursuant to SCBI's guidelines and rules," around the time the transfer took place. (*Id.*, ¶ 35.)

None of the factual allegations, however, plausibly suggests that SCBI and StanChart were not being operated as separate entities, however, or that StanChart was an agent for SCBI. These facts are just as consistent with friendly or cooperative relationships between companies related by a parent-subsidiary relationship, or between companies engaged in a mutually beneficial business transaction. *See Gerritsen v. Warner Bros. Entertainment Inc.*, 116 F. Supp. 3d 1104, 1139–40 (C.D. Cal., 2015) (finding that these and other facts are "common aspects of parent-subsidiary relationships" and not necessarily indicative of an "alter ego" relationship); *In re Conseco Ins. Co. Annuity Mktg. & Sales Practices Litig.*, 2008 WL 4544441, at *6 (N.D. Cal., Sept. 30, 2008) (finding that the sharing of some officers and administrative and operational infrastructure did not establish an agency relationship).

Although the SAC alleges that Serena and Garnica both acted in a "dual capacity" (*i.e.*, everything they did was for both SCBI and StanChart) from early 2008 onward (SAC, ¶ 32), this conclusion is not supported by any facts.

Although this defect was pointed out to Plaintiffs before, the SAC does not allege facts plausibly showing that SCBI and StanChart were each other's agents, or were derivatively liable for each other's acts. It has not shown why each Defendant is liable for any acts other than its own.

**Analysis: StanChart**

The SAC clarifies that the three claims it is bringing against StanChart are for breach of fiduciary duty, negligence, and unjust enrichment. The allegations against StanChart remain thin, vague, and conclusory. The only acts of fraud or negligence alleged are general bad investment advice and failure to prevent financial losses. SAC, ¶¶ 36–37.) None of the StanChart's bad advice is ever specifically alleged. The SAC claims only that employees of StanChart "periodically met or otherwise communicated with" Plaintiffs or with their son. (SAC, ¶ 39.) Some of the interactions occurred at StanChart's office in San Diego

and involved Ray Garnica. (*Id.*, ¶¶ 42–43.) The remaining allegations against StanChart involve litigation history or other matters not giving rise to any liability, and several wholly conclusory claims of breach of fiduciary duty (*Id.*, ¶¶ 458–61), negligence (*Id.*, ¶¶ 464–71), and unjust enrichment (*Id.*, ¶ 477.) It also attributes to StanChart liability for actions that SCBI took before the account was transferred. (*Id.*, ¶¶ 472, 474.)

These and the other allegations against StanChart do not meet the pleading standard under *Twombly* and *Iqbal* as to any of the claims against it. Because Plaintiffs have long been on notice of the nature of their case and have been given multiple opportunities to plead a cause of action against StanChart, it is unreasonable to think they could so if they were given yet another chance.

**Analysis: Pleading Fraud with Particularity**

The complaint and amended complaint alleged that SCBI's representatives recommended investments that later turned out to be disastrous. Most of the allegations focus on how wrong the advice was, and how SCBI was motivated to recommend investments to its clients based more on what SCBI wanted to sell than on what its clients wanted. But a profit motive, bad advice, and a bad outcome do not amount to fraud.

Plaintiffs' account was non-discretionary, meaning that SCBI itself did not execute trades or make investments except on Plaintiffs' instructions. (SAC, ¶ 48, 98.) Plaintiffs allege, however, that SCBI's representatives knew that they would "invariably" do as recommended however. (*Id.*) Because of this, the SAC concludes, SCBI effectively controlled Plaintiffs' account. (*Id.*, ¶ 99.) Plaintiffs did, however, reject some investment recommendations, because they were conservative investors. (*Id.*, ¶ 100.) Plaintiffs have not alleged that SCBI ever executed a purchase or trade other than on their instructions, or otherwise mishandled their account. Any fraud, malfeasance, or negligence, therefore, must

arise from SCBI's recommendations or advice, or failure to make recommendations or give advice that was required.

The SAC has added a few new allegations, and has bulked up the existing allegations in the amended complaint by adding explanations and some argument. Most of the explanations are directed at showing why the advice SCBI gave was bad and how it caused harm. In a few cases the SAC adds extra information such as the name of a person or a general date. The most helpful allegations specify which of the two companies are supposed to have made the representation (in almost all cases, SCBI).

Plaintiffs are clearly capable of making specific allegations when they want to. Paragraph 202 of the SAC, for example, alleges that at a meeting in March of 2005 with Ray Garnica, the Gavaldons and their son expressed concern about the portfolio's leverage. This same paragraph, quoting Garnica's notes, alleges what Garnica told them. This particular allegation does not support an inference of fraudulent intent, but at least it is specific as to the details of the meeting and communication. Hardly any of the SAC's allegations are detailed.

**Life Insurance**

The SAC alleges that SCBI persuaded Plaintiffs to purchase a $10 million life insurance policy, though it was unsuitable for their needs. The only specific factual allegations added to this section say that Carlos Gadala-Maria and Simon Adich made sales pitches to Plaintiffs in San Diego. (SAC, ¶ 204.) They do not mention the time, or even the year. The allegations suggest that in 2005 and 2006, SCBI realized the insurance policy was not suitable for Plaintiffs. (SAC, ¶¶ 206–207). But because the allegations don't say when the sales pitches were made, or even when Plaintiffs bought the policy, they do not allege that at the time the sales pitches were made, the employees or SCBI itself knew or should have known that the policy was unsuitable or that anything said to Plaintiffs was false or misleading.

The SAC only makes clear that these sales pitches took place before 2007. (SAC, ¶¶ 212, 216.)

In their earlier motion to dismiss, Defendants represented that Plaintiffs purchased the life insurance policy in 2003. (Docket no. 24-1 at 9:25–26 and 10 n.6.) If this is true, the SAC's allegations about what SCBI knew or said after that does not show that SCBI knew the statements were false or misleading when made. It also supports Defendants' argument that any claim arising from their purchase of the life insurance policy is time-barred.

Plaintiffs have avoided alleging with particularity fraud as to the sale of the life insurance policy, even after this deficiency was pointed out to them and they were given an opportunity to amend. The Court therefore finds this claim cannot be successfully amended. There also is no reason to believe Defendants can successfully amend any of their other claims, to the extent they arise from the sale of the insurance policy.

**GEMSTB Investment**

Beginning in June of 2005, Plaintiffs at SCBI's urging invested in the Global Emerging Market Short-term Bond Fund ("GEMSTB"), as a result of which they later lost money. They made these purchases in June, 2005, September, 2006, January, 2007, and January, 2008. (SAC, ¶ 117.) The only representations alleged with any specificity identify particular people who falsely told Plaintiffs GEMSTB was a "conservative investment," low-risk, and appropriate given their desire for security and income. (SAC, ¶ 118.) No allegations identify a time when any of this advice was given, and it is not clear whether the statements were made before the purchase or after. Without any time alleged, the SAC's allegations show SCBI at some point internally labeled GEMSTB a lower-risk investment. (*Id.*, ¶ 120.) In May, 2005, GEMSTB's holdings consisted of speculative bonds (*id.*, ¶ 121), although the SAC does not say that was true at the time SCBI personnel advised Plaintiffs to buy the fund, or at the time they did buy it. And at times, its

internal records or information in its possession show GEMSTB was a high-risk investment. (*Id.,* 122–24) The SAC alleges the recommendations were either false or reckless. (*Id.,* ¶¶ 118, 126.) The only specific allegation about a representation that identifies the person, the time, and what was said is found in paragraph 128, which concerns some literature Luisa Serena gave Plaintiffs about the fund. But that paragraph says she gave it to them in February, 2008, after they made their last purchase.

The SAC goes on to allege that only after Plaintiffs lost money with this investment, did GEMSTB's managers change its investment objectives to reflect that it was taking an aggressive rather than moderate-to-conservative approach, and increased the fund's risk factor. (SAC, ¶¶ 154–55.)

Because the allegations omit most of the critical time references, they do not plausibly show SCBI knew the statements were false when made. Furthermore, some of the claims appear to be time-barred. In addition, the SAC agrees the advice may have been negligent, rather than knowingly false, and that the only dishonesty may have been failing to inform Plaintiffs of what SCBI later learned about the fund. (SAC, ¶¶ 156–57.)

The SAC also alleges that that SCBI failed to disclose that it was violating its own internal guidelines, as if to suggest it had a duty to do so. (SAC, ¶ 136.) While this might be helpful in establishing scienter, nothing in the SAC suggests that Plaintiffs relied on SCBI's internal guidelines, or even on any representation that SCBI was following its own internal guidelines. *See also In re Bayou Hedge Fund Litigation*, 534 F. Supp. 2d 405 (S.D. N.Y. 2007) (investment firm's alleged violation of its own self-imposed standards and procedures could not support fraud claim).

**Miscellaneous Investments and Strategies**

The SAC alleges that SCBI recommended various other unsuitable investments or investment strategies, including the purchase of hedge funds (SAC,

¶¶ 159–71), structured notes (*id.*, ¶¶ 172–79), and "Signature Global Equities" (*id.*, ¶¶ 180–88); and buying on margin (*id.*, ¶¶ 189–203). These are almost entirely devoid of specific allegations of who said what to Plaintiffs, and when.

The only allegations that mention specific facts are too vague and general to show fraud. In paragraph 165, the SAC says Carlos Gadala-Maria in April of 2006 said Plaintiffs should increase their risk by buying more shares of the Permal FX, Fwd and Futures fund. But it does not say what he told them to convince them of this, or what was false about it, only that it was poor advice. (*Id.*, ¶ 166.) In paragraph 173, an unnamed person is alleged to have said that he told Plaintiffs that they should view structured notes as conservative or "capital guaranteed" investments. And again in paragraph 202, Ray Garnica is alleged to have given Plaintiffs advice about whether it was a good idea for Plaintiffs' account to be as leveraged as it was. None of this, however, alleges facts showing that the advice involved statements known to be false, as opposed to mere bad or unsuitable advice.

Some of the fraud claims are based on a characterization of trailer fees as "kickbacks," which is how some SCBI personnel apparently referred to them internally. But as the Court ruled earlier, there is no basis for characterizing these as bribes or as giving rise to a fraud claim.

**Fairfield Sentry**

The allegations focus most heavily on SCBI's recommendation of Fairfield Sentry, which was a feeder fund in to the Bernard Madoff Investment Securities. While the SAC is replete with allegations suggesting that SCBI was negligent in recommending this investment, the allegations are not specific enough to show fraud in most respects. Most allegations concern what SCBI should have known, not what it actually knew. And they concern mostly internal communications or matters of public record, not things represented to Plaintiffs.

/ / /

Most allegations by SCBI concern due diligence, but are not made with particularity. Most of the allegations that identify anyone by name merely say that the person in question recommended purchase of the fund, or inaccurately referred to it as an appropriate or conservative investment. (SAC, ¶¶ 227, 268.) Some of the allegations imply that the person in question mentioned due diligence, without alleging what was said. (*Id.*, ¶ 246.)

The only allegation about representations of due diligence is a statement that in March, 2004, Carlos Gadala-Maria told Plaintiffs that the fund was safe and secure, and that the recommendation of the fund was a product of its robust due diligence process. (SAC, ¶ 269.) Later, he is alleged to have told them that they should buy the fund to improve their portfolio's performance. (*Id.*, ¶ 275.) The SAC also alleges that he at some time told them the fund was a "risk reducer." (*Id.*, ¶¶ 278, 280.) Still later, in an "Investment products overview" in 2006, Ray Garnica told Plaintiffs the fund was a "great diversifier" even though he said earlier internally that it was intended for clients seeking non-diversified investments. (*Id.*, ¶ 279.) A Private Placement Memorandum that Plaintiffs should have been given, however, described the fund as high-risk and speculative. (*Id.*, 299–301.)

The SAC alleges further that in January 2008, Luisa Serena recommended that Plaintiffs purchase more shares, though it does not say what she told them. (SAC, ¶ 304.) It goes on to allege that Ray Garnica bolstered this recommendation by saying that he and SCBI thoroughly understood all funds it was recommending, and had a reasonable basis for recommending this one. (*Id.*, ¶ 305.) As a result, Plaintiffs that same month bought $800,000 worth of shares. (*Id.*, ¶ 306.)

These allegations concerning due diligence and the fund's safety rating are the only ones made with particularity as required under Rule 9(b). The one allegation about diversification is ambiguous. A representation that an investment is a "great diversifier" could mean it would help diversify an investor's portfolio, not

necessarily that it is a diversified fund. It is also not clear what Plaintiffs thought this remark meant, or that it had any relationship to their injury.

Representations that SCBI had conducted robust due diligence on the fund, and that as a result they were confident the fund was safe and secure could, however, support a finding of fraud. In analogous cases, similar representations have been held to be deceptive. For example, in *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 358 (S.D. N.Y. 2011), an investment manager allegedly represented that it and the investment advisor had "thoroughly researched" a Madoff fund, when in fact it had not. This was held to be a material misrepresentation.

In *Schwarz v. ThinkStrategy Capital Mgt. LLC*, 797 F. Supp. 2d 439, 441, 444–45 (S.D. N.Y. 2011), plaintiffs alleged that defendants misrepresented the extent and nature of due diligence they had performed in potential investments, and the process by which they made investment decisions. As a result, they allegedly induced plaintiffs to invest in fraudulent and worthless funds. Plaintiffs eventually suffered a financial loss they would have escaped if defendants' misrepresentations had not induced them to invest in the funds. The court rejected defendants' argument that because they did not know about the fund management's fraud, they lacked scienter. The point, the court noted, was whether defendants knew their own representations about due diligence were false. If they did, a jury could find them liable.

These allegations again argue that trailer fees amount to kickbacks. The Court has rejected, and continues to reject, the suggestion that fees are fraudulent or even evidence of fraud. Banks and investment houses routinely charge fees, commissions, and the like. Because they operate on a profit motive, they have a constant motive to recommend some kind of investment or other fee-generating transaction. The receipt of fees and commissions is not a sufficiently concrete
/ / /

13
16cv590-LAB (MDD)

motive to infer fraud. *See Anwar v. Fairfield Greenwich Ltd.*, 286 F.R.D. 258, 260 (S.D. N.Y. 2012).

The allegation that fees associated with the sale of Fairfield Sentry were higher than usual, and were specially negotiated offers some more support, but still fails to show fraudulent intent. The SAC makes clear, however, that SCBI was unwilling to sell Fairfield Sentry at all until the fees were increased. (SAC, ¶ 235.) This does not bespeak fraudulent intent so much as an intent to collect what SCBI thought was an appropriate fee for this particular investment. By contrast, if SCBI had been selling the fund already before obtaining a higher fee, the increase could suggest a motive for SCBI to shut is eyes to a known risk, thus making the allegations a little more plausible.

The SAC also alleges that SCBI's personnel lied internally to circumvent SCBI's own policies, in order to get permission for Plaintiffs to buy the fund. Because none of these were communicated to Plaintiffs they cannot by themselves give rise to a fraud claim. But lying to evade internal controls could support an inference that the person in question acted with scienter. Perhaps the strongest allegation in support of fraud, however, is the allegation that in March of 2004, SCBI directed Sergio Gavaldon to execute the signature page of the offering memorandum without providing him with the full document as required by SCBI's rules and by law. (SAC, ¶¶ 299–301.) The full document would have included a disclosure he alleges he was never given, *i.e.*, that the fund was speculative and involved a high degree of risk. Failing to disclose information required by law, which would ordinarily have been disclosed under SCBI's policies, can plausibly support a claim of fraud.

**Negligence and Breach of Fiduciary Duty**

These are the only two claims not sounding in fraud, and as such are not subject to Rule 9's pleading requirements. As discussed above, Plaintiffs have not met their pleading burden as to StanChart under the *Twombly*/*Iqbal* standard.

By contrast, the SAC alleges that SCBI gave investment advice as part of its services to Plaintiffs over the course of years. The investment advisor/client relationship gives rise to a fiduciary duty as a matter of law. *Hasso v. Hapke*, 227 Cal. App. 4th 107, 140 (Cal. App. 4 Dist. 2014). Plaintiffs have alleged that they were injured by breaches of its fiduciary duty, as well as its negligence.

**Statute of Limitations**

Although some claims are likely time-barred, the running of the statute depends in part on whether Florida or California law applies. But the running of the statute is not apparent on the face of the complaint.

**Conclusion and Order**

Plaintiffs' motion for leave to amend is **GRANTED IN PART**. Within **14 calendar days of the date this order is issued**, they may file a second amended complaint. The only fraud claim it may include is a claim against SCBI based on representations that SCBI had performed robust due diligence on Fairfield Sentry before recommending it as a safe and secure investment. It may also include negligence and breach of fiduciary duty claims against SCBI. The second amended complaint must not include claims against StanChart, or any other fraud claims, nor may it expand the fraud claim beyond what this order permits.

**IT IS SO ORDERED**.

Dated: February 20, 2019

*Larry A. Burns*
Hon. Larry Alan Burns
Chief United States District Judge