UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANGELICA GAVALDON, et al.,<br><br>                              Plaintiffs,<br><br>v.<br><br>STANDARD CHARTERED BANK INTERNATIONAL (AMERICAS) LTD.<br><br>                              Defendant. | Case No.:  16cv590-LAB (MDD)<br><br>**ORDER GRANTING IN PART MOTION TO DISMISS; AND**<br><br>**ORDER PERMITTING BRIEFING ON SUPPLEMENTAL JURISDICTION AND REMAND** |

This is the latest of several cases involving securities claims connected with the Bernie Madoff investments scandal. Plaintiff Angelica Gavaldon is an individual investor who alleges Defendants misled her and her late husband Sergio about investments, causing them to lose money. Plaintiffs S&A Investments, Inc. and Harley Invest Ltd. are Cayman Island pass-through entities that the Gavaldons formed in order to invest.  Plaintiffs, who are represented by counsel, have formally amended three times, and have been given specific instructions about the deficiencies in their pleadings.  (*See* Docket nos. 20, 28, 31, and 33.)

After the second dismissal, the Court required Plaintiffs to seek leave to amend, attaching their proposed second amended complaint along with a redline showing changes they proposed to make.  They filed an *ex parte* motion, attaching

1

a proposed 82-page second amended complaint. (Docket no. 29, Ex. A.) In a detailed order, the Court granted the motion in part. (Docket no. 31.) The order pointed out numerous defects in their proposed second amended complaint, directing them to amend it, and set a deadline for doing so. They then filed another 82-page proposed second amended complaint slightly late. The Court *sua sponte* struck this, pointing out that they had not complied with its instructions regarding amendment, directing them to amend and refile, and cautioning them to take care that the newly-filed second amended complaint complied fully with the Court's previous order. (*See* Docket no. 33.) After additional minor difficulties and delays, prompting an order to show cause, Plaintiffs filed their corrected second amended complaint. (Docket no. 36, the "SAC"). In all, they have submitted or filed four drafts of the proposed second amended complaint.

Defendant Standard Chartered Bank International ("SCBI") then moved to dismiss, both for lack of prosecution and for failure to state a claim. That motion is now fully briefed and ready for adjudication.

**Motion to Dismiss**

The motion correctly points out that Plaintiffs have had several opportunities to draft a complaint that meets federal pleading requirements. It also correctly points out that the latest SAC did not limit the scope of claims as directed by the Court's order granting in part leave to amend and did not correct all the defects the Court's order pointed out. In particular, the SAC includes theories that Plaintiffs were directed not to include at all, such as claims of fraud other than those based on the Fairfield Sentry (Madoff/Sentry) investments. At the early stages of litigation, pleading defects are more excusable. But at this point, Plaintiffs have filed or submitted seven versions of the complaint. Dismissal for failure to prosecute and for failure to obey the Court's orders would not be unreasonable.

That being said, "[c]ases should be decided on the merits whenever reasonably possible." *Eitel v. McCool*, 782 F.2d 1470, 1472 (9th Cir. 1986)

16cv590-LAB (MDD)

(citation omitted). Rather than treating failure to amend as a default, the Court finds it more appropriate to construe failure to amend as a tacit admission that further amendment is not possible. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (court's discretion to deny leave is "particularly broad" where a plaintiff has already been given leave to amend, and has "failed to add the requisite particularity to its claims"). *See also Covert v. City of San Diego*, 2017 WL 1094020, at *4 (S.D. Cal., Mar. 23, 2017) (construing failure to amend as plaintiff's admission that he cannot plead more facts to cure the complaint's defects). When claims are dismissed for repeated failures to cure pleading deficiencies, dismissal with prejudice is appropriate. *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993). And to the extent the SAC has included claims or theories that Plaintiffs were ordered to omit, the Court can construe the complaint to correct these defects.

**Previous Rulings and Law of the Case**

The Court's previous orders (particularly Docket nos. 20, 28, 31, and 33) are law of the case. In the order dismissing the first amended complaint, the Court permitted Plaintiffs to include only one fraud claim: "a claim against SCBI based on representations that SCBI had performed robust due diligence on Fairfield Security before recommending it as a safe and secure investment." (Docket no. 31 at 15:13–15.) The Court also permitted Plaintiffs to include negligence and breach of fiduciary duty claims against SCBI, but expressly forbade any other fraud claims, and forbade Plaintiffs to expand the fraud claim beyond what the order permitted. (Id. at 15:15–18.)

Plaintiffs represent that the SAC complies with the Court's order. Taking them at their word, the Court construes the SAC as abandoning all fraud and fraud-based claims, except the "due diligence" misrepresentation claim in connection with sales of Madoff/Sentry. The first claim (for Fraud) and the second claim (for Deceit), while enumerated as separate claims, are based on the same alleged

misstatements regarding due diligence. Rather than striking one of them as unauthorized, the Court construes them as the same claim.

While the first amended complaint mentioned in passing that unidentified Defendants failed to disclose "certain facts," (Docket no. 21, ¶ 422), the SAC adds legal conclusions regarding SCBI's fiduciary duties, and suggests Plaintiffs are adding a claim of fraud by omission. (*See, e.g.*, SAC, ¶¶ 420–21 (alleging a duty of good faith, a duty to disclose conflicts of interest, and an ongoing duty to disclose other material facts).) Ordinarily the Court would grant leave to amend to add claims, but there is no reason to do so when amendment would be futile or would unduly prejudice the Defendant. *See Chappel v. Laboratory Corp. of Am.*, 232 F.3d 719, 725–26 (9th Cir. 2000). Although fraud by omission may be somewhat easier to plead, because Plaintiffs need not specify the circumstances of a misrepresentation, the SAC still fails to plead enough facts to show when SCBI knew the facts it should have disclosed. If Plaintiffs' theories about duties to disclose conflicts of interest and other facts are correct, they can recover just as easily — or perhaps more easily — under a breach of fiduciary theory. There is no reason to add new half-formed and inadequately pled theories of fraud at this point. Such an amendment would only cause delay and impose undue costs and burdens on SCBI.

While the SAC still includes various other allegations of misrepresentations and deception, the Court will treat them as background, intended to make the one authorized fraud claim more plausible — for example, by showing motive or general business practices. And to the extent this order discusses the pleading of those claims, this discussion is intended to illustrate the general state of the pleading. Discussion is not intended as reconsideration: Plaintiffs did not seek reconsideration, and the Court is not reconsidering its earlier orders.

Governing substantive law has not yet been determined. The parties argue that either California or Florida substantive law applies. Which, if either, applies

depends on a fact-based determination of whether the parties entered into an agreement with a valid choice-of-law provision. And the differing statutes of limitations and accrual provisions will likely affect the viability of several claims.

But in any event, federal pleading standards apply. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009). These orders cited Rule 9(b)'s pleading requirements, and pointed out how those earlier complaints failed to satisfy these requirements. These and other rulings constitute law of the case, and are binding on the parties. To the extent the SAC still fails to meet pleading requirements, the implication is that additional attempts at amendment would be futile.

Among other things, the Court directed Plaintiffs to allege who made particular representations, rather than referring to SCBI generally. (Docket no. 28 at 11:23–27.) This is particularly appropriate when the Gavaldons were meeting or talking with someone they knew, either in person or by phone, or when they received written communications from an identifiable person. The Court directed Plaintiffs to identify when particular representations were made, rather than referring to a span of time, to show SCBI knew at the time that what it was saying to the Gavaldons was false, misleading, or unreliable. (*Id.* at 11:27–12:4.) The Court also pointed out that, to constitute fraud, misrepresentations or other deceptive communications must have been made to the Gavaldons so that the Gavaldons could rely on them. Internal communications and statements to the public that Plaintiffs do not allege they heard directly or indirectly or relied on cannot give rise to fraud claims. *See Mirkin v. Wasserman*, 5 Cal.4th 1082, 1098–1100 (1993). Therefore, Plaintiffs were required to allege that they heard or learned of the allegedly fraudulent representations, and when they did so.

The Court directed Plaintiffs to plead facts in context, rather than relying on isolated or stray remarks, or alleging their own conclusions as facts. *See* Kearns, 567 F.3d 1126 (holding that plaintiff should have alleged what advertisements and

sales material specifically stated). For example, Plaintiffs' allegations that undisclosed trailer fees amounted to kickbacks were insufficient, even if someone connected with SCBI used this term. (*Id.* at 12:10–11; Docket no. 20 at 10:16–23.) "The context in which they were described as kickbacks should also be alleged, in order to show that the payments actually were kickbacks and not permitted and appropriate fees of some kind." (*Id.* at 10:21–23.) Using jargon that sounds to outsiders like something nefarious does not reasonably show that it is.[1] Plaintiffs did not plead facts showing that the fees were in fact illicit. And while a firm's desire to collect fees and thereby increase its profits might be a motive for fraud, it is also consistent with ordinary business objectives and is in itself unremarkable. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002).

The SAC says or implies that certain terms, such as "due diligence," have recognized meanings within the industry, and also says that these or similar terms were mentioned in conversations with the Gavaldons. With regard to fraud claims, these allegations are not particularly helpful unless coupled with allegations showing the Gavaldons knew what these meanings were and relied on them. The SAC makes clear the Gavaldons were unsophisticated and had almost no knowledge of investing. (*See, e.g.*, SAC, ¶¶ 5, 77, 153, 166.) Whatever they were told must be examined in light of this, not in light of a level of sophistication they lacked, or information they did not have.

The context of representations or communications is also important, for several reasons. Statements in the course of oral presentations cannot be

---

[1] Insider jargon or industry-specific terms do not necessarily mean what they do to others. The jargon used in the context of securities, investments, and finance is replete with colorful terms not intended literally. By way of example, "junk bonds" are bonds rated below "investment" grade. Despite the evocative names, junk bonds are not considered valueless, and both "junk" and "investment grade" bonds are commonly purchased as investments.

16cv590-LAB (MDD)

considered in isolation but must be viewed in the context of the whole presentation. *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989). To show that a statement is material and intended to induce reliance, rather than amounting to mere puffery, *see id.*, the context must be alleged so that the Court can consider it. The situation in which remarks are made informs their intended meaning, and the recipient's likely interpretation. *See Xu v. Chiacache Int'l Holdings Ltd.*, 2016 WL 4370030, at *5 (C.D. Cal., Aug. 15, 2016) (citing *In re Syntex Corp. Securities* Litigation, 95 F.3d 922, 929 (9th Cir. 1996)). In a pleading, omitting context that would normally be included, or failing to plead enough facts to put particular remarks in context at all may deprive the allegations of the required particularity or plausibility. *See Dyson, Inc. v. Garry Vacuum, LLC*, 2011 WL 13268002, at *13 (C.D. Cal., Jan. 4, 2011) (holding that, because falsity is determined by examining statements in context, plaintiff's failure to plead context meant the complaint did not satisfy Fed. R. Civ. P. 8).

**Claims Not Sounding in Fraud**

The Court earlier identified only two claims as not sounding in fraud and thus not subject to Rule 9(b)'s pleading requirements: negligence, and breach of fiduciary duty. As pled in the SAC, the sixth claim for unjust enrichment[2] is based on SCBI's alleged "misdeeds" in connection with recommending Madoff/Sentry. This claim could be construed as arising from fraud, breach of fiduciary duty, or both. Because Plaintiffs were not permitted to expand fraud claims or add new fraud claims, and because they represent that they have not attempted to do so,

---

[2] Although the SAC lists it as a cause of action, unjust enrichment merely refers to restitution. *See Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (Cal. App. 4 Dist. 2010) (citations and quotation marks omitted) ("There is no cause of action in California for unjust enrichment . . . . Unjust enrichment is synonymous with restitution.") The Court construes the sixth claim as a theory of recovery for breach of fiduciary duty.

the Court construes this claim as based solely on breach of fiduciary duty, not fraud. The Court also accepts Plaintiffs' representation that they disclaim any fraud-based theory of unjust enrichment.

**The SAC**

As pled, Plaintiffs' claims all arise under state common law. Although plaintiffs in similar lawsuits have elected to bring claims under federal statutes, Plaintiffs have chosen to rest their claims solely on state causes of action. *See Hunter v. Philip Morris USA*, 582 F.3d 1039, 1042 (9th Cir. 2009). While precedent dealing with federal securities fraud claims under federal law may be helpful in addressing pleading standards, the elements of their claims are different.

The Court has diligently compared the proposed second amended complaint it previously found inadequate (Docket no. 29, Ex. A) and the latest SAC. The bulk of Plaintiffs' amendments are *pro forma*, cosmetic, or insubstantial, or represent mere reiterations of other existing allegations. Of the remainder, most merely eliminate claims or theories already dismissed, or add conclusions without any new facts to support them. Certain facts offered in support of claims dismissed without leave to amend are re-alleged, including the recommendation of a life insurance policy. The Court construes these allegations as supporting the remaining claims only. The notable new allegations are:

> Paragraph 32: Certain investment specialists who communicated with the Gavaldons at various times are identified by name.

> Paragraph 85: When the Gavaldons' son Angel asked Luisa Serena to provide the family with a list of highly-rated corporate bonds, the SAC now alleges she was the assigned relationship manager at the time.

> Paragraphs 114 and 115: SCBI allegedly never told the Gavaldons their investments in the GEMSTB fund was risky rather than safe, conservative, and appropriate to their needs.

/ / /

/ / /

Paragraphs 237 and 260: Carlos Gadala-Maria is alleged to have told the Gavaldons in about March of 2004 that a full due-diligence review had been conducted on Madoff/Sentry.

Paragraphs 243–248: SCBI allegedly never told the Gavaldons that it had failed to follow its own internal due diligence policy with regard to site visits to fund managers when recommending Madoff/Sentry.

Paragraph 340: This paragraph alleges that Madoff/Sentry was a hedge fund, which requires more due diligence.

**Legal Standards**

A motion to dismiss challenges the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The Court must accept all factual allegations as true and construe them in the light most favorable to Plaintiffs. *Cedars Sinai Med. Ctr. v. Nat'l League of Postmasters of U.S.*, 497 F.3d 972, 975 (9th Cir. 2007). But the Court will not supply facts not pled. *See Ivey v. Board of Regents of Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982). "Nor is the [C]ourt required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

While the Court does not weigh evidence or make credibility determinations, *Acosta v. City of Costa Mesa*, 718 F.3d 800, 828 (9th Cir. 2013), the complaint must meet the plausibility standard set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The well-pleaded facts must do more than permit the Court to infer "the mere possibility of misconduct"; they must show that the pleader is entitled to relief. *Id.* at 679. To defeat a motion to dismiss, the factual allegations must be sufficient to "raise a right to relief above the speculative level . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The SAC, like any amended pleading, is required to be complete in itself, without reference to previous versions of the complaint or other documents. *See*

Civil Local Rule 15.1(a). Although this order may discuss earlier versions of the complaint, its focus is on the sufficiency of the SAC as filed. *See Song v. Drenberg*, 2019 WL 1998944, at *1 (N.D. Cal., May 6, 2019) (court may consider prior allegations as part of its plausibility inquiry).

In federal court, fraud claims — including those arising under state law — must be pled with particularity as required by Fed. R. Civ. P. 9(b). *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1102 (9th Cir. 2003). This pleading standard applies to any claims grounded in fraud or sounding in fraud, including claims for fraudulent nondisclosure. *Kearns,* 567 F.3d at 1225–26.

The Rule 9(b) standard requires Plaintiffs to allege who made the misrepresentations, how the misrepresentations were conveyed to them, and under what circumstances. *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1998). The complaint must allege the "who, what, when, where, and how" of the charged misconduct. *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010). The allegations must include the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). When determining whether the standard is met, the Court considers the complaint as a whole. *See United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1181 (9th Cir. 2016) (finding that allegations "in the context of the complaint as a whole" adequately alleged details of fraudulent conduct).

In a limited class of cases, Rule 9(b)'s pleading requirements may be relaxed pending discovery, if the evidence needed to make those allegations is within a defendant's exclusive possession. *Ebeid*, 616 F.3d at 999. While this might apply to some of SCBI's internal communications or records, it cannot apply — at least, not in full — to material the SAC quotes, such as SCBI's publications or other public statements. In the case of institutionally-authored materials or statements, the person behind the remarks may not always be known, but most other

information (*e.g.*, the time, manner of communication, and context) is known, and should be alleged. And a relaxed pleading standard does not apply at all to any of the alleged in-person or telephonic communications with or representations to the Gavaldons. To the extent this relaxed standard applies, Plaintiffs must still state the factual basis for their beliefs. *See Neubronner*, 6 F.3d at 672; *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (9th Cir. 1987).

**Discussion: Fraud Claim**

The elements of common law fraud are misrepresentation (*e.g.*, by false representation, concealment, or nondisclosure), knowledge of its falsity (or scienter), intent to induce reliance, justifiable reliance, and resulting damage. *Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1996). Although the issue of agency was not raised or briefed, the Court's working assumption is that acts of SCBI's employees acting within the scope of their duties are imputed to SCBI. *See In re ChinaCast Educ. Corp. Securities Litigation*, 809 F.3d 471, 474 (9th Cir. 2015). That said, the person making a representation or promise should be identified, if possible.

In the context of fraud, mere "puffery" — that is, generalized, vague, or unspecific assertions; optimistic statements amounting to merely subjective assessments; or a statements of opinion rather than knowingly false statements of fact — is not actionable. *See Retail Wholesale & Dept. Store Union Local 338 Retirement Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017). This is so, in part, because investors do not reasonably rely on such statements. *Ore. Pub. Employees Retirement Fund v. Apollo Group, Inc.*, 774 F.3d 598, 606 (9th Cir. 2014); *City of Roseville Employees' Retirement Sys. v. Sterling Fin'l Corp.*, 963 F. Supp. 2d 1092, 1120 (E.D. Wash., 2013), *aff'd* 691 Fed. Appx. 393 (9th Cir. 2017).

While the SAC continues to allege numerous communications, most of these allegations are far too vague, and illustrate why the fraud claims based on them

were dismissed. Allegations describing a person communicating with the Gavaldons only as "SCBI" do not satisfy the "who" prong. *See Kearns*, 567 F.3d at 1126 (pointing out that the plaintiff had not alleged who made allegedly fraudulent statement on behalf of the company). Although the SAC alleges personnel who filled various roles over time, it generally avoids saying these were the people who communicated with the Gavaldons. In addition, the "when" allegations are generally too vague to be of much help, even if it were clear who worked with the Gavaldons during particular periods of time. In addition, the allegations are not in clear chronological order, making it difficult to know what descriptive words such as "thereafter" mean. Very few allegations identify a specific date on which communications were made. (*See* ¶¶ 86, 110, 223.) Several identify at least a month and year. But most allege either a very general time period or a large span of time. (*See, e.g., id.,* ¶¶ 32 ("periodically met or otherwise communicated"); 70 ("Occasionally"); 111 ("Throughout this time period," referring to June 2005 through January 2008); 128 ("By 2008"); 140 ("thereafter," *i.e.*, after events in August, 2008); 155 ("over time"); 203 ("in approximately 2007").)

The SAC attempts to establish SCBI's knowledge that its representations were false by alleging numerous internal communications in which individuals questioned SCBI's practices. Here, alleging dissent among SCBI's ranks is not enough; to the contrary, internal disagreement implies that SCBI had no single settled view. Merely alleging that SCBI made representations to the public or other investors might help show scienter, but it is not enough to satisfy the "misrepresentation" prong, unless the Gavaldons heard or read, and relied on the representations. This is particularly true when the time and circumstances of the representations are not specified (which is the case with most allegations). Of the few factual allegations made with the requisite specificity, none reasonably show that SCBI in fact knew at the time its statements were false. They may show carelessness, but that is not the same as fraud.

Turning to the one fraud claim Plaintiffs are still pursuing, the SAC claims SCBI falsely represented it had conducted due diligence on Madoff/Sentry securities. The SAC is replete with allegations of SCBI's failure to notice warning signs, and to the extent their claims are based on negligence, the SAC is sufficient. The SAC also alleges SCBI's failure to disclose that it had not conducted due diligence on the Madoff/Sentry securities. But the SAC mentions representations to the Gavaldons about due diligence only a few times, and those allegations are almost devoid of particulars. The only paragraphs alleging that a particular person (rather than "SCBI" generally) communicated something particular to them about due diligence are 70, 213–14, 217, 237, 260, and possibly 274. These all point to a meeting in March of 2004 when the SAC alleges Gadala-Maria told the Gavaldons over the phone that a full due diligence review had been conducted on the Madoff/Sentry investments, and that SCBI's recommendation of Madoff/Sentry followed a robust due diligence process. (SAC, ¶¶ 237, 258, 260, 271.) The SAC says this was part of Gadala-Maria's recommendation of the investment, and was accompanied by assurances that it was safe, secure, and consistent with a conservative investment approach. (*Id.* ¶ 259, 274.)

The SAC also alleges that Ray Garnica and Luisa Serena reiterated these representations afterwards "on an ongoing basis," without mentioning any dates, time frame, or context. SCBI recommended purchases of Madoff/Sentry to the Gavaldons twice: once through Gadala-Maria (apparently in March of 2004), and later through Luisa Serena (apparently in January of 2008). (*Id.*, ¶¶ 218, 295, 305.) These apparently were the only two occasions when the Gavaldons purchased the fund. Someone allegedly recommended in July of 2007 that the Gavaldons maintain their position in Madoff/Sentry, but the SAC does not say who. (SAC, ¶ 294.) While Serena or someone else might have made representations about due diligence at these times, the SAC does not say so. While the SAC suggests that Serena probably said something to the Gavaldons about due diligence in

16cv590-LAB (MDD)

January of 2008, the Court has had to piece together disparate paragraphs to come up with this conclusion. And even then, the SAC does not provide a context or say what in particular she said, other than to conclude it amounted to the same kind of representation the Gavaldons had heard more than four years earlier. Allegations about what the Gavaldons may have been told at any time other than in March of 2004 do not meet Rule 9's pleading standards.

The SAC says SCBI performed only very limited due diligence of its own on the Madoff/Sentry fund, and its continued efforts to perform more were unsuccessful. It says SCBI carelessly relied on assessments by the investment firm Fairfield Greenwich Group ("FGG"), without knowing how reliable that assessment was or what due diligence if any FGG had conducted on Madoff/Sentry. (*See* SAC, ¶ 322.) It is clear FGG had some way of assessing Madoff/Sentry, because it made disclosures regarding the riskiness of the Fairfield Sentry fund, which changed over time. (*Id.*, ¶ 223.)

The SAC says SCBI did cursory due diligence on FGG, or relied on Fairfield to conduct its due diligence. (SAC, ¶¶ 328, 336, 371, 372, 374–75.) And it says SCBI had in its files a due diligence report on Fairfield Sentry in 2004. (*Id.,* ¶ 377.) While the SAC alleges that SCBI's representatives told the Gavaldons in March of 2004 that SCBI's recommendation of the fund was the product of a robust due diligence process, the alleged facts do not show that in March of 2004 SCBI or its representatives knew no one had done due diligence on Madoff/Sentry.

Although the SAC suggests that SCBI gave the Gavaldons the impression that it had performed due diligence entirely by itself, in-house, no factual allegation shows that anyone ever told them this. The SAC merely alleges they were told that a due diligence process existed, and that robust due diligence procedures had been followed. What this meant, and what the Gavaldons could reasonably have understood it to mean at the time, is not alleged. The SAC alleges that SCBI made representations to the public in general implying it had conducted its own in-house

due diligence. (SAC, ¶¶ 69, 259–61.) And it alleges SCBI's own internal rules required it conduct due diligence in-house. (*Id.*, 373.) But the SAC does not allege that the Gavaldons heard or relied on these representations to the public, or that they knew what SCBI's internal rules were. *See, e.g., Kearns*, 567 F.3d at 1126 (finding fraud pleadings deficient, in part, because the plaintiff failed to allege when he was exposed to alleged misrepresentations, which ones he found material, or which he relied on).

In the securities fraud context, general statements to the effect that advisors had conducted six months of extensive and even exhaustive due diligence have been characterized as mere puffery. *See City of Austin Police Retirement Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 297 (S.D. N.Y. 2013). Here, descriptors such as "robust" and "best in the business" imply opinions or value judgments, not verifiable factual assertions. And even assuming SCBI told others the particular investigatory steps it was taking (*see* SAC, ¶ 71), it only vaguely told the Gavaldons its due diligence amounted to a "process." (*Id.*, ¶ 257.) By contrast, where both parties understand due diligence to have a definite meaning, representations about it may amount to factual assertions rather than puffery. *See CMFG Life Ins. Co. v. RBS Securities, Inc.*, 799 F.3d 729, 745–46 (7th Cir. 2015). Even assuming "due diligence" has a definite meaning within the investment industry — at least, with regard to hedge funds such as Madoff/Sentry[3] — the SAC does not allege the

---

[3] "Due diligence" generally refers to an appropriate level of background investigation. Here, it means the kind of investigation that would have been appropriate or necessary before SCBI recommended or sold Madoff/Sentry investments or other hedge funds. Not surprisingly, the meaning of "due diligence" can vary depending on the investment under consideration. *See Due Diligence*, DICTIONARY OF BUSINESS TERMS (3d ed. 2000) (describing due diligence as aimed at various characteristics of a proposed investment); *Due Diligence*, DICTIONARY OF INTERNATIONAL INVESTMENT TERMS (2001) (giving examples of the types of activity that due diligence might include).

16cv590-LAB (MDD)

Gavaldons knew what that was, or could have interpreted Gadala-Maria's remarks as pertaining to industry standards or regulatory requirements being met.

The SAC also refers to Gadala-Maria's misrepresentation to the Gavaldons that Madoff/Sentry and perhaps other investments were "safe" or "secure," and appropriate for conservative investors even though they were rated as risky. Because these allegations are connected with the "due diligence" claim, the Court will analyze them as such, rather than treat them as an expanded theory of fraud.

While misrepresentation of risks can amount to actionable fraud, mere puffery will not suffice. According to the SAC, the ratings were apparently either internal and generated by SCBI (SAC, ¶ 66), or possibly were provided by FGG. (*Id.*, ¶ 233). The SAC's allegations make clear that the Gavaldons, who were unsophisticated investors, would not have been asking about analysts' ratings, but rather were seeking advice about how to invest.

Two decisions are instructive here. In *City of Roseville*, the plaintiff alleged that the defendant had falsely identified its banking practices as "safe and sound." Even assuming "safe" and "sound" had an established meaning in the banking sector, the complaint provided no factual support for the suggestion that they had any specific, well-understood meaning among investors. *City of Roseville*, 963 F. Supp. 2d at 1121. *Casella*, by contrast, dealt with a situation where an advisor had described an investment as a "sure thing." In context, this was held not to be mere puffery, because she had coupled it with "specific misrepresentations of fact" about the investment's profitability and tax benefits, which were intended to induce reliance. 883 F.3d at 808. In the context of the entire presentation, *Casella* explains, what might otherwise be puffery or a mere statement of opinion may be actionable. *Id*. But allegations that the investment was said to be "safe," or "secure," with little or no discussion of the context in which the remark was made, are not enough.

/ / /

The SAC does not allege the source of or basis for these ratings generally, except to argue that it was insufficient, or allege facts showing Gadala-Maria agreed with this rating. Furthermore, insider terms do not necessarily mean what they do to others. *See supra* note 1. The alleged facts do not reasonably show that an investment product internally rated as risky was in fact risky or dangerous as outsiders (such as the Gavaldons) would understand the term. Because the Gavaldons were unsophisticated investors, it is unclear what they would have made of the internal ratings even if they had known what they were. And though the SAC refers to the ratings, particular SCBI communications, and FGG's legal disclosure pages, it does little more than characterize them.

In the securities fraud context, the Ninth Circuit has treated similarly generalized references to internal records or conclusions as insufficient. In *In re Silicon Graphics Inc. Securities Litigation*, the plaintiff alleged that company officers received internal reports notifying them of serious production and sales problems with a particular product, and that in spite of this they continued to make positive representations to investors. 183 F.3d 970, 984 (9th Cir. 1999). The panel held that the complaint lacked sufficient detail and foundation necessary to plead a claim with particularity. For example, the complaint failed to plead facts relating to the reports, including the contents, who prepared and reviewed them, and where the information in them came from. *Id.*

Similarly, in *Lipton*, 284 F.3d at 1035–36, plaintiffs alleged that defendants had access to data informing them that demand for a product was flat and would not increase. Although the plaintiffs referred to the existence of the data and made a "general assertion about what they think the data shows," *id.* at 1036, their own negative characterization was not enough. Although these cases were brought under different provisions of law, the principle that plaintiffs must plead factual information, not merely their own conclusions about the facts, is the same.

/ / /

16cv590-LAB (MDD)

To an extent, the context in which advisors reassured the Gavaldons of various investments' suitability and safety can be pieced together from the remainder of the complaint, but it is not entirely favorable to them. They contend they "did not want or need anything but safe investments producing modest investment returns," and that at all relevant times SCBI knew these were their goals. (SAC, ¶¶ 80–84.)

The SAC alleges that Gadala-Maria lied to SCBI about their investment goals and experience and other characteristics, in order to evade SCBI's internal safeguards that would otherwise have prevented them from investing in Madoff securities. (SAC, ¶¶ 277–89.) It also alleges that an unnamed person at SCBI, in violation of SCBI's requirements, induced Sergio Gavaldon in March of 2004 to sign a document authorizing the purchase of Madoff securities, without providing him the private placement memorandum that would have told him the shares were speculative and risky. (*Id.* 290–92.)[4] Both sets of allegations are somewhat helpful to the Gavaldons, in that they are at least somewhat specific and point to dishonesty. SCBI might be vicariously liable for Gadala-Maria's acts, even though he was allegedly acting against SCBI's instructions. That said, his alleged lies were to SCBI, not the Gavaldons. With regard to the product placement memorandum, the SAC fails to allege who induced Sergio Gavaldon to sign the document. Bearing in mind that this person too is alleged to have been acting contrary to SCBI's instructions and might have been trying to avoid detection, Plaintiffs were in a superior position to identify who this was.

/ / /

---

[4] For unknown reasons, Fairfield removed this warning from the legal disclosure pages in 2005, prompting SCBI to ask why, and suggesting it might add the disclosure itself. (SAC, ¶ 223.) The SAC makes clear the memorandum included pages of legal disclosures, and neither party has provided a copy of it, so it is unclear how prominent the disclaimer was.

16cv590-LAB (MDD)

The SAC alleges SCBI personnel talked with the Gavaldons about such issues as the degree to which their investments were leveraged, their liquidity, and the goal of increasing their returns. In July, 2003, an unnamed SCBI employee had a discussion with Angel Gavaldon, recommending that his parents take a more aggressive position to improve portfolio performance. (SAC, ¶ 108.) In March, 2005, the Gavaldons and Ray Garnica discussed the degree of leverage in their portfolio, and whether improved returns justified keeping the leverage there. (*Id.*, ¶ 193.). In a September, 2006 meeting, Gadala-Maria and others discussed the cost of leverage and status of structured notes with the Gavaldons. (*Id.*, ¶ 92.) Around July 6, 2007, Luisa Serena met with the Gavaldons, and they told her both that they thought they could sell GEMSB shares to raise money, and that they were aware of an upcoming loan payment on their life insurance policy. (*Id.*, ¶ 131.) These more specific allegations undermine the broad and generalized allegation that the only goals the Gavaldons ever agreed to pursue were safe and conservative investments and modest income.

It is also clear the Gavaldons needed more than just a modest income to live on, at least towards the end of the time at issue here, and that they were assigned a more aggressive risk rating as a result. (SAC, ¶ 80.) They knew they were borrowing money for investments and for the life insurance policy. (*Id.*, ¶¶ 189, 191, 201.) Although the SAC implies that the Gavaldons were unaware that they would need more income than before to pay for the cost of interest and insurance premiums, it is clear they did know this. (*Id.*, ¶¶ 131, 205, 210.) The SAC's conclusion that the conservative Gavaldons believed they were investing in products as low-risk (and low-return) as CDs or bonds (*id.*, ¶ 96) and would never have been interested in seeking higher returns is unsupported by the factual allegations.

Even if the Gavaldons had known the risk ratings that had been internally assigned to the investments, it is unclear what meaning they could have assigned.

They apparently knew they were taking an increasingly aggressive approach in exchange for greater returns. If they were defrauded in spite of this knowledge, the SAC does not allege particular facts to show it.

Whether the Gavaldons should ever have been advised to borrow money, or to buy the life insurance policy is another question. But SCBI's recommendations of the insurance policy and margin purchases of securities are the subject of different claims: negligence or breach of fiduciary duty, not fraud. (SAC, ¶¶ 180 (alleging negligence), 195–209 (alleging sale of an unsuitable insurance policy).)[5] In other words, SCBI's negligence or breach of fiduciary duty might have created the need for the Gavaldons to take on higher-risk investments. But the SAC does not plead facts showing that SCBI committed fraud in later selling them those investments, particularly the Madoff/Sentry investments that are the subject of Plaintiffs' one surviving fraud claim.

Fraud can also be premised on concealment, or on non-disclosure when there is a fiduciary or buyer-seller relationship between the parties. *Lazar*, 12 Cal.4th at 638; *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336–37 (Cal. App. 4 Dist. 1997). But even under such a theory, the claim must be pled with particularity in federal court. The closest the SAC comes to meeting the standard is in connection with the Madoff securities and failure to provide the private placement memorandum. But even if Plaintiffs were authorized to add a new theory of fraud,

---

[5] The SAC alleges that SCBI sold the insurance policy in order to obtain fees and commissions, and not to help the Gavaldons, and that SCBI never disclosed the size of the commissions. (SAC, ¶ 209.) But failure to disclose the amount of insurance commissions is not ordinarily fraudulent. Most people buying insurance realize that the broker or seller must be earning a commission, and that the amount of the commission affects the cost. *See, e.g., Kennedy v. Jackson Nat'l Life Ins. Co.*, 2010 WL 4123994, at *10 (N.D. Cal., Oct. 6, 2010) (insurer had no duty to disclose amount of commissions to purchasers). The SAC never alleges that the Gavaldons were deceived about the policy itself.

16cv590-LAB (MDD)

their failure to identify who induced Sergio Gavaldon to sign the agreement while withholding the memorandum renders it insufficient. And allegations about due diligence and other information Plaintiffs claim SCBI was obligated to disclose are not specific enough. Under this theory, and other theories Plaintiffs have advanced, the SAC's pleadings of fraud fail to meet Rule 9's standards.

**Other Claims**

Even after being given multiple opportunities to amend, Plaintiffs have failed to plead any claim sounding in fraud. SCBI's motion does not, however, show that their non-fraud claims are inadequately pled. Their claims for negligence, breach of fiduciary duty, and unjust enrichment (based on breach of fiduciary duty, not fraud) survive.

**Jurisdiction and Remand**

In the notice of removal, Defendants identified both diversity and federal question jurisdiction under the Edge Act as the basis for removal. Because federal question jurisdiction was present, diversity was merely an alternate theory and the Court did not scrutinize the allegations closely or require amendment of the notice. But in light of this case's procedural posture, it appears remand may be in order.

The notice of removal implies that the Gavaldons should be treated as citizens of Mexico, and that their trust entities should be treated as citizens of the Cayman Islands. The Court previously suggested that the Gavaldons were not admitted as permanent residents, and no party corrected that impression. But through the course of this litigation, it has become apparent that the Gavaldons are not merely frequent visitors to the United States. Rather, they remain here for a good part of the year and own a house here. If either or both of them were admitted as permanent residents at the time of removal, diversity would be destroyed as provided by 28 U.S.C. § 1332(a)(2). Furthermore, no facts were alleged to show either of the trust entities' citizenship. *See Laroach v. BridgePoint Healthcare, LLC*, 2018 WL 6434768, at *2 (D.D.C. Dec. 7, 2018) (describing

16cv590-LAB (MDD)

considerations for determining a trust entity's citizenship); *In re A.H. Robins Co., Inc.*, 197 B.R. 575, 577 (E.D. Va. 1995) (outlining factors for determining citizenship of trusts). Bearing in mind that "SCBI and/or its agents" served as the trustees (SAC, ¶ 9), it is likely the Plaintiff trusts are not diverse from Defendant SCBI.

While Edge Act jurisdiction was present at the time of removal, with the dismissal of multiple claims, it has now disappeared. The Edge Act provides for federal jurisdiction over claims against an Edge Act entity (SCBI) arising from a transaction or series of transactions involving international banking or other international financial operations. 12 U.S.C. § 632. The "international" prong is satisfied only if the suit arises out of an offshore transaction of the Edge Act corporation. *American International Group, Inc. v. Bank of America Corporation*, 712 F.3d 775, 784 (2nd Cir. 2013). The surviving claims (particularly following dismissal of all fraud-based claims) have almost nothing to do with international or foreign banking or international financial operations. SCBI's management, regulatory, and compliance functions were maintained in and operated from New York. (SAC, ¶ 29.) The SAC makes clear the two trust entities were ignored, and SCBI dealt directly with the Gavaldons. (*Id.*, ¶¶ 11, 17). It did this in San Diego, not overseas. (*Id.*, ¶¶ 6, 26, 34, 35.) The investments and other products the Gavaldons invested in were purchased in U.S. markets and held in U.S. accounts, and the agreements between the Gavaldons and the banks were governed by U.S. law and regulated by U.S. entities such as NASD and FINRA. (*Id.*, ¶¶ 20–22, 43.)

The only mention of any international involvement is an allegation that SCBI maintained its due diligence functions in Switzerland. (SAC, ¶ 29.) But any subjects of due diligence relevant to this action — FGG, Madoff, and Sentry — were located and did business in the U.S. No banking or financial transactions are alleged to have been undertaken in Switzerland or any other foreign country.

/ / /

The fact that some foreign parties were involved does not transform what would otherwise be a state law claim into an Edge Act case. *See generally Allstate Ins. Co. v. Citimortgage, Inc.*, 2012 WL 967582 *3 (S.D.N. Y. March 13, 2012) ("[T]he Edge Act does not confer jurisdiction merely because there was a federally chartered bank involved, there were banking-related activities, and there were foreign parties . . . . Instead, courts must carefully examine the nature of the transaction said to ground § 632 jurisdiction, [citations omitted]").

While the Ninth Circuit has recognized that the Edge Act amounts to a "broad grant of jurisdiction," *City & Cnty. of San Francisco v. Assessment Appeals Bd.*, 122 F.3d 1274, 1276 (9th Cir. 1997), "broad" does not mean absolute. *People v. Wells Fargo & Co.*, 2015 WL 4886391, at *6 (C.D. Cal., Aug. 13, 2015) (recognizing that uniformly resolving questions in favor of Edge Act jurisdiction "would lead to absurd results").

With the issuance of this order, Plaintiffs' claims amount to common law claims arising out of the recommendation and sale of investments with no real international financial or banking element.  Neither the sales nor the financial advice occurred overseas or involved international banking or financial transactions.

Under 28 U.S.C. § 1367, the Court has discretion to decline to exercise supplemental jurisdiction over claims if all claims the Court had original jurisdiction over have been dismissed, or the remaining claims raise novel or complex issues of state law.  Both of these apply here. Although the Court had jurisdiction when the case was removed, all Edge Act claims have been dismissed. And the remaining claims involve lingering and complex choice of law issues that require application of state law to resolve. The Court has discussed these in previous orders.

/ / /

/ / /

**Conclusion and Order**

All claims are **DISMISSED WITH PREJUDICE**, except Plaintiffs' claims for negligence, breach of fiduciary duty, and unjust enrichment (based on a breach of fiduciary duty theory).

The Court proposes to decline to exercise supplemental jurisdiction over these remaining claims, and to remand them. If any party believes the Court can and should continue to exercise jurisdiction over them, they should file a memorandum of points and authorities not longer than ten pages, within **14 calendar days of the date this order is issued**.

**IT IS SO ORDERED**.

Dated: February 20, 2020

Hon. Larry Alan Burns
Chief United States District Judge